UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

TRACY MASCIOTTA, as parent and guardian of
V.M.,

            Plaintiff,

    -v-

THE CLARKSTOWN CENTRAL SCHOOL
DISTRICT, CAROL NAPIER, SUSAN GOLD, and
MARY KAY HUMENN,

            Defendants.

Case No. 14-CV-7128 (KMK)

OPINION & ORDER

---

Appearances:

Joseph Raphael DeMatteo, Esq.
Bernfeld, DeMatteo & Bernfeld, LLP
New York, NY
*Counsel for Plaintiff*

Adam I. Kleinberg, Esq.
Anthony Francisco Cardoso, Esq.
Sokoloff Stern LLP
Carle Place, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

       Tracy Masciotta has brought this Action as the parent and guardian of V.M. ("Plaintiff")

under 42 U.S.C. § 1983 and New York state law, alleging that Carol Napier ("Napier"), Susan

Gold ("Gold"), Mary Kay Humenn ("Humenn") (collectively the "Individual Defendants"), and

the Clarkstown Central School District (together with Napier, Gold, and Humenn,

"Defendants"), violated the United States Constitution and the New York State Constitution and

committed a number of state common law torts.  Defendants move to dismiss all claims.  For the

following reasons, Defendants' Motion To Dismiss is granted.

## I.  Background

### A.  Factual Background

The following facts are taken from Plaintiff's Complaint and are presumed to be true for the purposes of this Motion.  Plaintiff is a 14-year-old student at Clarkstown North High School, which is part of the Clarkstown Central School District (the "School District").  (Compl. ¶ 1 (Dkt. No. 1).)  At the time of the events complained of, Napier was a school psychiatrist employed by the School District; Gold was a school social worker employed by the School District; and Humenn was a registered nurse employed by the School District.  (*Id.* ¶¶ 3–5.)

On December 9, 2013, Plaintiff reported to Napier's office "to complete a scheduled test." (*Id.* ¶ 16.)  When Plaintiff entered the office, she "observed that [D.H.], who is a fellow student and friend" was in the office.  (*Id.* ¶ 17.)  Plaintiff asked why D.H. was there.  (*Id.* ¶ 18.) Napier responded that D.H. "was on her schedule and that it [was] difficult to explain," and told Plaintiff to leave.  (*Id.*)  Plaintiff left the office.  (*See id.* ¶ 19.)  Plaintiff later received a phone call from D.H., who told her that Napier "was questioning him about a purported cut on Plaintiff's leg," and that Napier believed Plaintiff had showed D.H. this cut, but that he "denied that he had ever seen such a cut, or knew anything about it." (*Id.* ¶¶ 19–20.)

Gold then approached Plaintiff, told her that she had been looking for her, and "gestured for Plaintiff to accompany her to the Nurse's Office."  (*Id.* ¶ 21.)  When they arrived at the Nurse's Office, Humenn was present, and Gold informed Plaintiff and Humenn "that they were present in the Nurse's Office because there supposedly exist[ed] a carving of a cat on Plaintiff's leg and it need[ed] to be checked." (*Id.* ¶¶ 22–23.)[1]  Plaintiff replied, "No, I don't."  (*Id.* ¶ 24

---

[1] The Complaint is silent on when Plaintiff supposedly had made this carving on her leg, or when Defendants believed her to have done so.

(internal quotation marks omitted).)  Gold responded, "Yes, you have to."  (*Id.* (internal

quotation marks omitted).)  "Despite there being an unoccupied medical examination room in the

Nurse's Office," Humenn "directed Plaintiff into a small storage closet" in the Nurse's Office.

(*Id.* ¶ 25.)  "Once Plaintiff and . . . Humenn entered the closet, . . . Humenn closed the door."

(*Id.* ¶ 26.)  "Plaintiff inquired as to what to do, and . . . Humenn directed Plaintiff to pull her

pants down."  (*Id.* ¶ 27.)  Plaintiff "lowered her pants to approximately knee level," and Humenn

told her to "lower her pants to . . . her ankles," and Plaintiff complied.  (*Id.*)  Humenn "inspected

Plaintiff's legs," and did not find any cuts or bruises.  (*Id.*)  Humenn "also directed Plaintiff to

lift up Plaintiff's shirt."  (*Id.* ¶ 28.)  Plaintiff "lift[ed] her shirt up just beneath her brassiere."

(*Id.*)  Humenn "indicated that sometimes girls cut themselves in the area of their breasts, and

directed Plaintiff to lift the shirt over her brassiere."  (*Id.*)  Plaintiff complied, and Humenn

"inspected the front of Plaintiff's torso," then walked behind Plaintiff, "lifted the shirt up

Plaintiff's back, and inspected Plaintiff's back."  (*Id.* ¶¶ 28–29.)  Humenn "found no cuts,

bruises[,] or unusual marks on Plaintiff's body," and Plaintiff was permitted to exit the closet.

(*Id.* ¶ 30.)

Plaintiff alleges that in carrying out this search "Humenn intentionally both threatened to

and did make unwanted physical contact with Plaintiff by directing Plaintiff to lower her pants,

and by taking hold of Plaintiff's shirt and raising it above the level of Plaintiff's brassiere."  (*Id.*

¶ 73.)  Additionally, Plaintiff claims she "was subjected to unwanted and offensive physical

contact and was placed in imminent apprehension of unwanted and offensive physical contact."

(*Id.* ¶ 74.)  Moreover, Plaintiff alleges that she was "intentionally confined . . . in [a] storage

closet," she was "conscious of the confinement," she "did not consent to the confinement," and

that the confinement was not privileged.  (*Id.* ¶¶ 81–84.)  Plaintiff also claims that that "Gold and

Napier directed the strip search of Plaintiff," but she admits that this allegation is based on "the circumstances leading to the strip search of Plaintiff." (*Id.* ¶ 75.)

When Plaintiff exited the closet into the Nurse's Office, Gold was present and on the phone with Napier. (*Id.* ¶ 31.) Gold handed Plaintiff the telephone, (*id.* ¶ 31), and Napier told Plaintiff that she was "not being truthful about cutting herself, and urged Plaintiff to tell the truth, claiming that [D.H.] had told . . . Napier that Plaintiff showed [D.H.] the purported cut on Plaintiff's leg," (*id.* ¶ 32 (internal quotation marks omitted)). Plaintiff stated that "she had no marks on her and had never shown [D.H.] her leg, or any purported cut on her leg." (*Id.*) After the phone conversation, Humenn said, "I need to go through your phone," and Plaintiff replied, "No, you don't." (*Id.* ¶ 33 (internal quotation marks omitted).) Humenn "then searched through Plaintiff's phone, looking at Plaintiff's Instagram account, Facebook account, and all of her photo albums, before returning the phone to Plaintiff." (*Id.* ¶ 34.) This search also "did not reveal any evidence of self-cutting." (*Id.* ¶ 35.) Gold then called School Police Officer Matthew Barry, and told him that Plaintiff "had carved a cat into her leg and that the carving was seen in an Instagram photo, but that the search did not reveal any evidence of the carving." (*Id.* ¶ 36.) Plaintiff "spoke briefly on the telephone with Officer Barry and was then permitted to leave the Nurse's Office." (*Id.* ¶ 37.) Plaintiff "exited the office and ran out of the school building in tears." (*Id.* ¶ 38.)

According to Plaintiff, "[a]t no point prior to the search of Plaintiff[] did any of the Individual Defendants or any employee of the [District] contact Plaintiff's parents to either discuss the purported cutting, or to obtain permission to conduct the . . . strip-search of Plaintiff and search of Plaintiff's telephone." (*Id.* ¶ 39.) Additionally, Plaintiff alleges upon information and belief that the District "has neither disciplined any of the Individual Defendants for their

4

clearly unconstitutional and tortious conduct, nor put in place policies to avert future constitutional violations." (*Id.* ¶ 42.)  Additionally, Plaintiff alleges that "[a]t no point did the [District] or the Individual Defendants provide Plaintiff with any proof of the accusations against her, or allow Plaintiff to dispute such accusation, or object to the unreasonable detention and searches described above." (*Id.* ¶ 58.)

Plaintiff alleges that the Individual Defendants conspired to deprive Plaintiff of her rights.  In particular, she alleges that the "wrongful acts, omissions and Constitutional deprivations committed by the Defendants were part and parcel of an agreement and conspiracy between the various Individual Defendants to maliciously violate Plaintiff's civil rights." (*Id.* ¶ 46.)  Plaintiff further alleges upon information and belief that "each of the Individual Defendants was aware of, agreed to and/or approved of at least one overt act in furtherance of their conspiracy to deprive . . . Plaintiff of her Constitutional rights." (*Id.*)

Plaintiff alleges two bases for liability of the District.  First, Plaintiff generally alleges that the School District and its agents and employees "developed and maintained policies and/or customs exhibiting deliberate indifference to the Constitutional rights of Plaintiff and other students similarly situated." (*Id.* ¶ 54; *see also id.* ¶ 59 (alleging that the District, and its agents and employees "developed and maintained policies and/or customs exhibiting deliberate indifference to the Constitutional rights of Plaintiff and other students similarly situated, which caused a violation of Plaintiff's Fifth and Fourteenth Amendment rights")).)  Second, Plaintiff alleges that the School District is liable under respondeat superior because the "Individual Defendants were acting within the scope of their employment" with the School District "when they committed the wrongful acts." (*Id.* ¶ 65; *see also id.* ¶¶ 70, 78, 87, 92, 98, 103.)

Finally, Plaintiff alleges that she has "suffered mental anguish resulting in depression, loss of appetite, loss of sleep, nightmares, stomach pains, panic attacks, fear of closed spaces, fear of authority figures and discomfort at school," as well as "public humiliation and stigma." (*Id.* ¶¶ 40–41; *see also id.* ¶ 91 ("As a direct result of the Defendants['] actions, the Plaintiff was made to suffer extreme emotional and psychological damages.").)  Furthermore, she alleges that the "wrongful and illegal acts [of Defendants] were undertaken with the knowledge and intent that these acts would cause the Plaintiff grievous injury and damage," and that they were "undertaken with malice and wrongful intent." (*Id.* ¶¶ 101–02.)

From these factual allegations, Plaintiff asserts ten causes of action, each of which is asserted against all Defendants: (1) substantive deprivation and conspiracy to deprive Plaintiff of her constitutional rights under § 1983; (2) a violation of her Fourth Amendment rights to be free of unreasonable searches and seizures; (3) a violation of her Fifth Amendment right to Due Process; (4) a violation of her New York State constitutional rights to be free of unreasonable searches and seizures; (5) a violation of her New York State constitutional right to Due Process; (6) assault and battery; (7) false imprisonment; (8) intentional infliction of emotional distress; (9) negligent infliction of emotional distress; and (10) prima facie tort. (*Id.* ¶¶ 44–105.) [2]

B. Procedural Background

On March 5, 2014, Plaintiff served a Notice of Claim on the Town of Clarkstown. (*See* Decl. of Anthony F. Cardoso in Supp. of Defs.' Mot. To Dismiss ("Cardoso Decl.") Ex. B (Notice of Claim) (Dkt. No. 13).)  The Notice of Claim stated that James and Tracy Masciotta, as

---

[2] Plaintiff apparently erroneously labeled Claim Nine as "Intentional Infliction of Emotional Distress" in the Complaint.

parents and guardians of Plaintiff, made the following claims against the Clarkstown Central

School District:

> That Claimant's New York State and Federal Constitutional rights, including but not limited to those protected by the First, Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States were violated, in addition to rights created by State and Federal Statutes that guarantee that persons only be arrested, detained and/or searched upon probable cause. Further, that [C]laimant was detained falsely, without lawful authority and without privilege, wrongly and without privilege and lawful authority subjected to assault and battery, and falsely imprisoned, and unlawfully searched. Finally, that the Claimant's right to privacy has been violated and that the claimant has been illegally harassed by school personnel. All of the foregoing endangered the welfare of Claimant.

(*Id.* at 1.) Plaintiff filed the Complaint in this case on September 4, 2014. (Dkt. No. 1.)

Pursuant to a scheduling order entered by the Court, (Dkt. No. 11), and amended at the request of

the Parties, (Dkt. No. 16), Defendants filed their Motion To Dismiss and accompanying papers

on January 9, 2015, (Dkt. Nos. 12–14); Plaintiff filed her Opposition on February 13, 2015, (Dkt.

No. 17); and Defendants filed their Reply on February 27, 2015, (Dkt. No. 18). On May 19,

2015, the Court ordered the Parties to submit supplemental briefing on three issues: whether the

Court could consider the Notice of Claim, whether the Motion based on the adequacy of the

Notice of Claim was properly considered a motion under Rule 12(b)(1) or Rule 12(b)(6), and

whether the Notice of Claim sufficiently sets forth "the time when, the place where and the

manner in which the claim arose," as required by N.Y. Gen. Mun. L. § 50-e, and complied with

any other requirement pertaining to notices of claim under New York state law. (*See* Dkt. No.

19.) In response, Defendants and Plaintiff submitted the requested briefing on May 26, 2015 and

May 28, 2015, respectively. (*See* Dkt. Nos. 20, 23.)

## II.  Discussion

### A.  Standard of Review

Defendants move to dismiss Plaintiff's Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions . . . ."  *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (brackets, citations, and internal quotation marks omitted).[3]  "[A] formulaic recitation of the elements of a cause of action will not do."  *Id.* (citation omitted).  Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Id.* (internal quotation marks and brackets omitted).  Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ."  *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id; see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common

---

[3] The Court notes that Plaintiff's counsel's continued reliance on *Conley v. Gibson*'s "no set of facts" pleading standard more than eight years after it was overruled by *Twombly* is misplaced.  (*See* Pl.'s Mem. of Law in Opp'n to Def.'s Mot. To Dismiss the Compl. 10–11 (Dkt. No. 17).)

sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

   "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) ("In addressing the sufficiency of a complaint we accept as true all factual allegations . . . ." (internal quotation marks omitted)); *Dixon v. United States*, No. 13-CV-2193, 2014 WL 23427, at *1 (S.D.N.Y. Jan. 2, 2014) (report and recommendation) ("For the purpose of this motion to dismiss, we assume that the facts alleged in [the plaintiff's] complaint are true.").  Further, "[f]or the purpose of resolving [a] motion to dismiss, the [c]ourt . . . draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T&M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

   "In ruling on a 12(b)(6) motion, . . . a court may consider the complaint as well as any written instrument attached to the complaint as an exhibit or any statements or documents incorporated in it by reference," as well as "matters of which judicial notice may be taken, and documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Kalyanaram v. Am. Ass'n of Univ. Professors at N.Y. Inst. of Tech., Inc.*, 742

F.3d 42, 44 n.1 (2d Cir. 2014) (brackets and internal quotation marks omitted)), *cert. denied*, 135 S. Ct. 677 (2014); *see also Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) ("In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." (internal quotation marks omitted)); *Hendrix v. City of New York*, No. 12-CV-5011, 2013 WL 6835168, at *2 (E.D.N.Y. Dec. 20, 2013) (same).

      B.  Qualified Immunity

      Qualified immunity shields a "government official[] from liability for civil damages insofar as [his or her] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244 (2012) (internal quotation marks omitted).  Qualified immunity "'gives government officials breathing room to make reasonable but mistaken judgments' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (alteration in original) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011)).  "Qualified immunity protects public officials from civil liability only if (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Coggins v. Buonora*, 776 F.3d 108, 114 (2d Cir. 2015) (internal quotation marks omitted), *cert denied*, 135 S. Ct. 2335 (2015). Determining whether qualified immunity attaches "is guided by two questions: first, whether the facts show that the defendants' conduct violated plaintiffs' constitutional rights, and second, whether the right was clearly established at the time of the defendants' actions." *Golodner v. Berliner*, 770 F.3d 196, 201 (2d Cir. 2014) (alterations and internal quotation marks omitted).

These two questions "no longer need to be [addressed] in any particular order." *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 580 (S.D.N.Y. 2011); *see also Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."); *Golodner*, 770 F.3d at 201 ("We may address these questions in either order . . . .").

Because qualified immunity "reflects an *immunity from suit* rather than a mere defense to liability . . . it is appropriate to decide the issue of qualified immunity, when raised, at an early stage of the litigation, such as when deciding a pre-answer motion to dismiss." *Betts v. Shearman*, No. 12-CV-3195, 2013 WL 311124, at *4 (S.D.N.Y. Jan. 24, 2013) (internal quotation marks omitted), *aff'd*, 751 F.3d 78 (2d Cir. 2014). "[W]hen determining a motion to dismiss on qualified immunity grounds in advance of full merits discovery, the plaintiff's version of the facts is presumed to be true . . . ." *5 Borough Pawn, LLC v. City of New York*, 640 F. Supp. 2d 268, 285 (S.D.N.Y. 2009). In such cases, "the question to be answered is whether the defendant . . . , confronted with the facts as alleged by [the] plaintiff, could reasonably have believed that his actions did not violate some settled constitutional right." *Id.*

C.  Analysis

1.  Fourth Amendment Claim

Plaintiff claims that the physical and telephone searches violated her Fourth Amendment right to be free from unreasonable searches and seizures. (*See* Compl. ¶¶ 50–55.) As alleged by Plaintiff, the searches—both of her body and of her phone—were done for medical purposes. In particular, each search was done "for the purported purpose of determining whether Plaintiff had injured herself." (Compl. ¶ 7.) This is bolstered by Plaintiff's allegations that she was taken to

11

the nurse's office and that she was told that she was there because there allegedly was a cut on her leg, and it needed to be checked.  (*Id.* ¶¶ 22–23.)  Moreover, after Humenn searched Plaintiff's legs, and found no evidence of self-harm, she told Plaintiff to lift her shirt up because "sometimes girls cut themselves in the area of their breasts."  (*Id.* ¶ 28.)  Thus, as alleged, this second part of the strip search was also done for medical reasons—to search Plaintiff for evidence of cutting.  Finally, as alleged by Plaintiff, the phone search was also done to look for evidence of self-harm.  (*See id.* ¶¶ 33–36.)  There is no indication in the Complaint that the searches (and the alleged seizure incident to the search) were done for any reason other than for medical reasons, for example to look for contraband or evidence of rule breaking.[4]

The first issue the Court must address is whether the Fourth Amendment applies to the search and seizure at issue.  The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."  U.S. Const. Amend. IV.  The Fourth Amendment is not triggered unless a search or seizure has occurred, and "the antecedent question whether or not a Fourth Amendment 'search' [or seizure] has occurred is not so simple under [the Supreme Court's] precedent."  *See Kyllo v. United States*, 533 U.S. 27, 31 (2001); *see also Hearring v. Sliwowski*, 712 F.3d 275, 281 (6th Cir. 2013) ("[T]he Fourth Amendment's protections are not triggered until a search occurs.").

-------------------

[4] The Court notes that although Plaintiff alleges facts related to School Police Officer Matthew Barry, there is no indication that he was involved in the search because the Individual Defendants were looking for evidence of rule breaking or law breaking.  Rather, what Plaintiff alleges is that, *after* all of the searches were completed, Gold called Barry and told him that Plaintiff "had carved a cat into her leg and that the carving was seen in an Instagram photo, but that the search did not reveal any evidence of the carving," (Compl. ¶ 36), again indicating a medical purpose for the searches.  Indeed, the complaint does not allege that Officer Barry did any investigation or took any action as a result of Defendants' belief that Plaintiff had cut herself.

Generally speaking, the Fourth Amendment applies when the "objectionable conduct occurred [in the context] of a criminal investigation or other form of governmental investigation or activity." *See Poe v. Leonard*, 282 F.3d 123, 136 (2d Cir. 2002). Thus, the *purpose* of the search or seizure dictates whether or not it is considered a search or seizure under the Fourth Amendment. For example, in *Poe v. Leonard*, the Second Circuit considered a Fourth Amendment claim based on evidence that a state trooper asked the plaintiff to appear in a training video, told her to change her clothes in his office, and told her where to stand. *Id.* at 129. The plaintiff did as she was told, began undressing, and then saw that she was being videotaped by a camera planted by the trooper. *Id.* The Second Circuit reasoned that because the "surreptitious videotaping of [the plaintiff] during [the defendant's] assigned duties was for his personal reasons and not to advance any governmental purpose," the "Fourth Amendment simply [was] not implicated by his misconduct." *Id.* at 136–37.[5]

The Third Circuit has come to a similar conclusion. In *Doe v. Luzerne County*, 660 F.3d 169 (3d Cir. 2011), the plaintiff, a deputy sheriff, was infested with fleas while in the course of duty. *Id.* at 171–72. She was taken to a hospital to be decontaminated. *Id.* at 172. While there and undressed, two of the plaintiff's coworkers came into the decontamination room and began filming her. *Id.* at 173. The Third Circuit rejected the plaintiff's Fourth Amendment claim, holding that searches done "for personal reasons and outside the scope of a governmental investigation" cannot form the basis of a Fourth Amendment violation because "[t]he phrase 'searches and seizures' connotes that the Fourth Amendment regulates conduct that is somehow

---

[5] The Second Circuit did hold, however, that the plaintiff had stated a claim that the videotaping violated the plaintiff's right to privacy under the Fourteenth Amendment's due process clause. *See Poe*, 282 F.3d at 136–37.

designed to elicit a benefit for the government in an investigatory or, more broadly, an administrative capacity." *Id.* at 179 (some internal quotation marks omitted).

The precedent is mixed on whether searches and seizures undertaken for medical purposes are covered by the Fourth Amendment.  On one side, in *Dubbs v. Head Start, Inc.*, 336 F.3d 1194 (10th Cir. 2003), the Tenth Circuit addressed Fourth Amendment claims based on evidence submitted by parents that their children were "subjected to intrusive physical examinations, including genital examinations and blood tests, on school premises without parental notice or consent." *Id.* at 1197.  There, the Tenth Circuit rejected the defendants' argument that non-criminal and non-investigatory searches done for medical purposes are not covered by the Fourth Amendment.  *Id.* at 1204–07.[6]  However, in *United States v. Attson*, 900 F.2d 1427 (9th Cir. 1990), the Ninth Circuit held that because a doctor employed by the state "drew and analyzed [the criminal defendant's] blood for purely medical reasons, he did not possess the requisite intent to engage in a search or seizure under the fourth amendment." *Id.* at 1433.[7]  Additionally, in *Peete v. Metro. Gov't of Nashville & Davidson Cty.*, 486 F.3d 217, 219 (6th Cir. 2007), the Sixth Circuit noted that there was no "case authority holding that paramedics answering a 911 emergency request for help engage in a Fourth Amendment 'seizure' of the person when restraining the person while trying to render aid."

_____

[6] The court did not address the qualified immunity claim, and it does not appear to have been addressed in any subsequent decision.  *See Dubbs*, 336 F.3d at 1217 n.15.

[7] As the *Dubbs* court observed, the Ninth Circuit in *Attson* indicated that "for the conduct of a governmental party to be subject to the fourth amendment, the governmental party engaging in that conduct must have acted with the intent to assist the government in its investigatory or *administrative* purposes and not for an independent purpose." *See Dubbs*, 336 F.3d at 1205 (emphasis in original) (internal quotation marks omitted) (quoting *Attson*, 900 F.2d at 1433); *see also Attson*, 900 F.2d at 1433 ("In taking the blood, [the doctor] did not intend to elicit a benefit for the government in its investigative or administrative capacity.")

Courts within the Second Circuit also have held that searches for medical purposes are not searches under the Fourth Amendment. In *Kia P. v. McIntyre*, 2 F. Supp. 2d 281 (E.D.N.Y. 1998), *aff'd*, 235 F.3d 749 (2d Cir. 2000), a hospital conducted a urine test of an infant, which tested positive for methadone. *Id.* at 285. After receiving those results, a hospital social worker notified New York State Central Register of Child Abuse and Maltreatment, which, in turn, notified the Child Welfare Administration. *Id.* The court rejected the Fourth Amendment claim based on the testing of the child's urine, reasoning that "although the Fourth Amendment is triggered when state authorities have children undergo medical procedures for investigative purposes, the record . . . indicate[d] that the urine test was not ordered by [the Child Welfare Association] and was given for medical and not investigative purposes." *Id.* at 292 (citation omitted).[8] The court therefore concluded "that the administration of the urine test did not constitute a 'search' of [the child] in violation of the Fourth Amendment." *Id.*[9] Also, in *Chayo v. Kaladjian*, 844 F. Supp. 163, 169–70 (S.D.N.Y. 1994), the Court rejected a constitutional challenge to x-rays because they were ordered by a doctor "for medical rather than investigative purposes."

Based on this patchwork of cases, the Court cannot say that Defendants' conduct violated Plaintiff's clearly established constitutional right because it was not clearly established that

---

[8] In making this distinction, the court cited *van Emrik v. Chemung Cty. Dep't of Soc. Servs.*, 911 F.2d 863 (2d Cir. 1998), where the Second Circuit held that x-rays of a child done at the request of a social worker, and over the initial opposition of the attending physician, were done for investigative purposes and thus implicated the constitutional rights of the parents. *See id.* at 865, 867; *Kia P.*, 2 F. Supp. 2d at 292 (citing *van Emrik*, 911 F.2d at 867).

[9] Although this decision was affirmed by the Second Circuit, the court noted explicitly that the plaintiffs did not appeal the district court's rejection of the argument that "the testing of [the child's] urine for purely medical reasons constituted a 'search' within the meaning of the Fourth Amendment." *Kia P.*, 235 F.3d at 754.

Defendants' actions were even covered by the Fourth Amendment.  "In order for a constitutional right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  *Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 60 (2d Cir. 2014) (alteration in original) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)).  "This does not mean that there must be a factual equivalency between the case at issue and prior cases," but rather the "'salient question' instead is whether the case law at the time in question would have put reasonable [state actors] on 'fair warning' that their conduct violated the plaintiff's rights."  *See id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).  Thus, in some circumstances, out-of-circuit case law may be sufficient to render a constitutional rule clearly established.  In particular, the law must be "capable of making a reasonable person aware of whether an act violates a constitutional right—so that in fairness and pursuant to the purpose of qualified immunity to protect public officials acting in good faith, the defendant can be held to account for a violation."  *Id.* at 61.  For example, "where the law was established in three other circuits and the decisions of [the Second Circuit] foreshadowed the right, . . . the law was sufficiently 'well established' that its violation stripped the defendant of his immunity."  *Id.* at 61 (citing *Varrone v. Bilotti*, 123 F.3d 75, 79 (2d Cir. 1997)).  On the other hand, an out-of-circuit district court opinion and a reference by a different circuit in a non-precedential opinion does not make a right clearly established.  *See Matusick*, 757 F.3d at 61.  Here, the relevant out-of-circuit authority is split, with more courts holding that a search and seizure for medical purposes is not covered by the Fourth Amendment and, moreover, the precedent within the Second Circuit does not foreshadow the existence of Fourth Amendment protections but instead does the opposite.

Most instructive on this point is *Hearring v. Sliwowski*, 712 F.3d 275 (6th Cir. 2013).  In

*Hearring*, "a school nurse . . . conducted a visual examination of [a] six-year-old female

student['s] . . . genital area for medical purposes in response to the student's complaints of

itching and discomfort in the area."  *Hearring*, 712 F.3d at 277.  The student's mother sued,

alleging a violation of her daughter's Fourth Amendment rights.  *See id.*  The district court

denied the nurse-defendant qualified immunity, reasoning, based on school strip search cases,

"that school officials had fair notice that a strip-search of a student 'without justification' is

improper."  *Id.* at 280–81.  The Sixth Circuit reversed the district court's opinion, holding that

"[g]iven that there is no direct precedent from [the Sixth Circuit] holding that the Fourth

Amendment applies to visual examinations conducted by medical professionals for medical

purposes and some precedent indicating that the Fourth Amendment does not apply in such

circumstances," the court could not "say that it [was] clearly established under [its] precedent

that the conduct of a school nurse giving medical aid to students is subject to the standard of

reasonableness imposed by the Fourth Amendment."  *Id.* at 281–82.  The court also rejected the

notion that out-of-circuit authority, namely the *Dubbs* decision, could indicate that the right was

clearly established within the Sixth Circuit, because it "was not so clearly foreshadowed by

applicable direct authority as to leave no doubt in [the defendant's] mind that her examination of

[the child] would be held unconstitutional by this court," in particular because the decision was

"not obvious under [the Sixth Circuit's] precedent, and it [was] in direct conflict with decisions

of other courts of appeals."  *Id.* at 282.[10]  The same result is warranted here.  Given the

---

[10] In holding that the out-of-circuit authority was mixed, the *Hearring* court noted that the
Second Circuit's decision in *Tenenbaum v. Williams*, 193 F.3d 581 (2d Cir. 1999) addressed a
medical examination of a student done primarily for investigatory reasons, and therefore did "not
point unmistakably to the unconstitutionality" of the school nurse's conduct in that case.  *See*

contradictory holdings from different circuits, the fact that the balance of lower court decisions within the Second Circuit holds that searches for medical purposes are not covered by the Fourth Amendment, and the fact that the Second Circuit precedent does not foreshadow a holding that such searches and seizures are covered by the Fourth Amendment, the Court concludes that Defendants did not have fair warning that their search of Plaintiff for medical purposes violated Plaintiff's Fourth Amendment rights.  *See Matusick*, 757 F.3d at 60.

Therefore, Defendants are immune from liability on Plaintiff's Fourth Amendment claim, and Defendants' Motion To Dismiss this claim is granted.[11]

### 2.  Substantive Due Process Claim

Defendants seek dismissal of Plaintiff's substantive due process claim, arguing that, "[g]iven the availability of the Fourth Amendment as a source of constitutional protection, [P]laintiff cannot assert a substantive due process claim based on the same events."  (Defs.' Mem. 14.)  Defendants are correct that " [w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims."  *Tenenbaum v. Williams*, 193 F.3d 581, 599 (2d Cir. 1999) (internal quotation marks omitted) (quoting *Albright v. Oliver*, 510 U.S. 266, 266 (1994) (plurality

---

*Hearring*, 712 F.3d at 282 (citing *Tenenbaum*, 193 F.3d at 606); *see also Tenenbaum*, 193 F.3d at 606.

[11] This claim may be revived in an amended complaint if, for example, Plaintiff alleges facts tending to show that the search was done for non-medical purposes, for example, to look for evidence of violation of school rules or for contraband.  In such a case, the search would be covered by the Fourth Amendment, and the Court would apply the two-part test in *New Jersey v. T.L.O.*, 469 U.S. 325 (1985), to assess the reasonableness of such a search, keeping in mind the Second Circuit's instruction that that "as the intrusiveness of the search of a student intensifies, so too does the standard of Fourth Amendment reasonableness," *Phaneuf v. Fraikin*, 448 F.3d 591, 597 (2d Cir. 2006) (internal quotation marks omitted).

opinion)); *see also Kia P.*, 235 F.3d at 757–58 (same).  "Substantive due process analysis is

therefore inappropriate . . . if [the] claim is 'covered by' the Fourth Amendment."  *Cty. of*

*Sacramento v. Lewis*, 523 U.S. 833, 843 (1998).  However, as discussed above, the conduct at

issue is not covered by the Fourth Amendment.  Therefore, dismissal of the substantive due

process claim is not appropriate at this time on this ground.  *See Poe*, 282 F.3d at 138–39

(analyzing videotaping by police officer of the plaintiff done for the officer's personal purposes

as a substantive due process claim after holding that the Fourth Amendment did not apply

because the search was not done for any governmental or administrative purpose).[12]

---

[12] If, for example, Plaintiff files an amended complaint alleging a non-medical purpose for the search and seizure such that these allegations were covered by the Fourth Amendment, any substantive due process claim would be dismissed on this ground, even if Plaintiff fails to state a cognizable Fourth Amendment Claim.  That is because the question is whether the conduct at issue should be *analyzed under* the Fourth Amendment because it is conduct covered by the Fourth Amendment, not whether the conduct, if it does not violate the Fourth Amendment, might also violate the Due Process Clause.  *See Rinaldi v. City of New York*, No. 13-CV-4881, 2014 WL 2579931, at *7 (S.D.N.Y. June 10, 2014) (holding that the plaintiff's substantive due process claim based on the same conduct underlying his Fourth Amendment claim "must fail" despite the fact that the Fourth Amendment claims were dismissed for failure to state a claim), *adopted by* No. 13-CV-4881, 2014 WL 4626076 (S.D.N.Y. Sept. 15, 2014); *Cucuta v. New York City*, 25 F. Supp. 3d 400, 417–18 (S.D.N.Y. 2014) (granting summary judgment on substantive due process claim because the claims "sound in a search and seizure violation under the Fourth Amendment," and therefore the "Fourth Amendment . . . provides the proper analytical framework," despite granting summary judgment to the defendants on the Fourth Amendment claims); *Kastle v. Town of Kent*, No. 13-CV-2256, 2014 WL 1508703, at *6–*7, *9 (S.D.N.Y. Mar. 21, 2014) (dismissing substantive due process claims because they involved "conduct proscribed by the Fourth Amendment," and therefore were "substantially 'covered' by the Fourth Amendment," despite the fact that many of the plaintiffs' Fourth Amendment claims were dismissed for failure to state a claim); *Dunk v. Brower*, No. 07-CV-7087, 2009 WL 650352, at *8 n.7 (S.D.N.Y. Mar. 12, 2009) (analyzing the plaintiff's "claim under the Fourth Amendment, which protects against the type of unreasonable search and seizure which [the] [p]laintiff claims the defendant] subjected him to, and not the Fourteenth Amendment," despite granting summary judgement to the defendant on the Fourth Amendment claim); *Taylor v. Evans*, 72 F. Supp. 2d 298, 306, 310 (S.D.N.Y. 1999) (dismissing substantive due process claims because a strip search of a child and removal of the children from the parents constituted a search and seizure to be analyzed under the Fourth Amendment despite holding that the plaintiffs failed to state a cognizable Fourth Amendment claim).

Defendants also argue that Plaintiff "does not allege the level of 'conscience-shocking' behavior required to state" a substantive due process claim.  (Defs.' Mem. 15.)  Plaintiff disputes this, but does not cite any case law indicating that a strip search of a student by a nurse for medical purposes is conscience-shocking behavior and that this was clearly established at the time of the events in question.  (*See* Pl.'s Mem. of Law in Opp'n to Def.'s Mot. To Dismiss the Compl. ("Pl.'s Mem.") 30–31 (Dkt. No. 17).)

"Substantive due process protections extend only to those interests that are 'implicit in the concept of ordered liberty,' which are rights 'so rooted in the traditions and conscience of our people as to be ranked as fundamental.'"  *Smith v. Hogan*, 794 F.3d 249, 255–56 (2d Cir. 2015) (quoting *Palko v. Connecticut*, 302 U.S. 319, 325 (1937), *overruled in part on other grounds by Benton v. Maryland*, 395 U.S. 784, 794, (1969); *see also Reno v. Flores*, 507 U.S. 292, 303 (1993)).  As is relevant here, the Second Circuit has held that there is a clearly established "right to privacy in one's unclothed or partially unclothed body," which right is protected by substantive due process.  *Poe*, 282 F.3d at 138–39.  Additionally, the Court notes that the right to bodily integrity is a clearly established right protected by the Due Process Clause, *see Lombardi v. Whitman*, 485 F.3d 73, 79 (2d Cir. 2007) ("The substantive component of due process encompasses, among other things, an individual's right to bodily integrity free from unjustifiable governmental interference." (citing *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997))), although Plaintiff does not allege any physical injury as a result of Defendants' actions.  Finally, the Supreme Court has recognized a "protected liberty interest in refusing unwanted medical treatment."  *Cruzan ex rel. Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278 (1990).

However, merely alleging that a defendant impaired an interest protected by substantive due process is insufficient to state a substantive due process claim; rather, the action taken by the

state actor must have been "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."  *Lombardi*, 485 F.3d at 79 (internal quotation marks omitted); *see also Southerland v. City of New York*, 680 F.3d 127, 151 (2d Cir. 2011) (same); *Poe*, 282 F.3d at 139 (same).  Indeed, "[t]he core protection provided by the Due Process Clause is protection against arbitrary government action," and therefore the "touchstone of due process is protection of the individual against . . . the exercise of power without any reasonable justification in the service of a legitimate governmental objective."  *Poe*, 282 F.3d at 139 (alteration in original) (internal quotation marks omitted) (quoting *Lewis*, 523 U.S. at 845–46); *see also Southerland*, 680 F.3d at 151 ("Substantive due process rights safeguard persons against the government's exercise of power without any reasonable justification in the service of a legitimate governmental objective." (internal quotation marks omitted)).

Cases where the Second Circuit has held that government behavior shocks the conscience and is not shielded by immunity have one thing in common: there is no "reasonable justification in the service of a legitimate governmental objective."  *Lewis*, 523 U.S. at 846.  In *Poe*, for example, the Second Circuit held that:

> a police officer violates a person's constitutional right to bodily privacy when that officer manipulates the circumstances to view, to photograph, to videotape or otherwise to record that person's unclothed or partially unclothed body without his or her consent where . . . there is no conceivable investigative or otherwise proper law-enforcement interest advanced by such a viewing.

282 F.3d at 139.  There, however, it was clear that the defendant's actions were taken for *personal* reasons.  *Id.* at 137.  Similarly, in *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246 (2d Cir. 2001), the Second Circuit held that the student-plaintiff stated a substantive due process violation where he alleged that a gym teacher physically assaulted him, grabbing him by the throat, lifting him off the ground by his neck, dragging him across the gym floor, choking

him, and slamming his head against the bleachers and a metal fuse box, reasoning that the force was "malicious and sadistic," "intended only to oppress or to cause injury and serve[d] no legitimate government purpose," and was likely to cause substantial injury, and therefore "unquestionably shock[ed] the conscience." *Id.* at 249, 252. The Second Circuit denied immunity, holding that the defendant was "on notice that he could not use intentionally harmful force in the absence of a legitimate and discernible government aim." *See id.* at 253. Courts have similarly found substantive due process violations and denied immunity based on sexual abuse of children by school officials. *See, e.g.*, *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 450, 452 (5th Cir. 1994) ("[The plaintiff's] substantive due process claim is grounded upon the premise that schoolchildren have a liberty interest in their bodily integrity that is protected by the Due Process Clause of the Fourteenth Amendment and upon the premise that physical sexual abuse by a school employee violates that right . . . . Obviously, there is never any justification for sexually molesting a schoolchild, and thus, no state interest, analogous to the punitive and disciplinary objectives attendant to corporal punishment, which might support it.").

Here, though, there was a legitimate government objective for the action: protecting the health and welfare of students for which Defendants were responsible. *See Bd. of Educ. v. Earls*, 536 U.S. 822, 830 (2002) (noting that "in a public school environment[,] . . . the State is responsible for maintaining discipline, health, and safety"); *Burlison v. Springfield Pub. Sch.*, 708 F.3d 1034, 1039 (8th Cir. 2013) ("A student's privacy interest is limited in a public school environment where the State is responsible for maintaining discipline, health, and safety." (internal quotation marks omitted)), *cert. denied,* 134 S. Ct. 151 (2013); *Lebron v. Sec'y, Fla. Dep't of Children & Families*, 710 F.3d 1202, 1210 (11th Cir. 2013) ("[T]he individual privacy rights of the students . . . are limited in a public school environment where the State is

responsible for maintaining discipline, health, and safety." (internal quotation marks omitted)).

Moreover, no party has alerted the Court to any case in which a court addressed whether an

unreasonable strip search of a student for medical purposes was sufficiently conscience-shocking

to state a substantive due process claim, and the Court has not found any such case. *Cf.*

*Hearring*, 712 F.3d at 283 (taking "no position on whether [the nurse's] conduct may have been

actionable under a different provision of the Constitution"). In the absence of any cases

addressing this issue, or even any analogous cases, the Court cannot say that reasonable state

actors would have been aware that they were violating Plaintiff's rights. *Matusick*, 757 F.3d at

60.[13]  Furthermore, although this search by Defendants was arguably ill-advised, the Court

cannot say that it was so egregious and outrageous to shock the conscience. In particular, unlike

in *Poe* and *Johnson* and the child sexual abuse cases, there was a legitimate governmental

purpose underlying the search. Moreover, unlike here, in *Poe*, the plaintiff was videotaped while

undressed or partially undressed. 282 F.3d at 139. And, unlike here, in *Johnson*, the behavior by

the teacher not only was malicious and sadistic; it also was likely to cause substantial injury. 239

F.3d at 252. Furthermore, the search was conducted in private, only in front of a medical

professional of the same gender as Plaintiff, and did not require Plaintiff to get fully undressed,

factors that point away from the search being conscience-shocking. Therefore, the Court

dismisses Plaintiff's substantive due process claim on qualified immunity grounds.

---

[13] The Court notes that the Second Circuit has instructed that a constitutional right need not be established with as much particularity to defeat qualified immunity "for claims based on intentionally tortious harmful conduct employed in the absence of any legitimate government interest." *Poe*, 282 F.3d at 139. However, this is not the case here.

### 3.  § 1983 Conspiracy Claim against the Individual Defendants

In her opposition to Defendants' Motion To Dismiss, Plaintiff abandoned her section 1983 conspiracy claim.  (*See* Pl.'s Mem. 2 ("In response to Defendants' argument aimed at Plaintiff's section 1983 conspiracy theory, Plaintiff withdraws her substantive conspiracy count.").)  Therefore, this claim is dismissed.  *See Alvarez v. County of Orange*, — F. Supp. 3d —, 2015 WL 1332347, at *12 (S.D.N.Y. Mar. 25, 2015) (dismissing claims where the plaintiff conceded he had failed to plausibly plead them and stated that he did not oppose the relief requested by the defendants); *Willner ex rel. Willner v. Doar*, No. 12-CV-1955, 2013 WL 4010205, at *1 (E.D.N.Y. Aug. 5, 2013) (dismissing a claim after the plaintiff made concessions in his opposition brief and consented to the dismissal of his due process claim); *Murphy v. Keller Indus., Inc.*, No. 95-CV-7643, 2002 WL 91622, at *1 (S.D.N.Y. Jan. 23, 2002) (granting the defendant's motion to dismiss the claim against it after the plaintiff, in her opposition papers, "expressly conced[ed] that her claim against the [g]overnment [was] barred by the Federal Tort Claims Act").

### 4.  Constitutional Claims against the School District

Plaintiff asserts Fourth and Fifth Amendment claims under § 1983 against the School District.  Federal constitutional claims asserted against school districts are analyzed under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).  *See Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257–58 (2009) ("A plaintiff stating a . . . claim via § 1983 . . . by a school district or other municipal entity must show that the [violation] was the result of municipal custom, policy, or practice." (citing *Monell*, 436 U.S. at 694)); *T.P. ex rel. Patterson v. Elmsford Union Free Sch. Dist.*, No. 11-CV-5133, 2012 WL 5992748, at *2 (S.D.N.Y. Nov. 27, 2012) ("A school district may be liable for deprivation of a student's rights

pursuant to Section 1983 'when execution of a government's policy or custom, whether made by

its lawmakers or by those whose edicts or acts may fairly be said to represent official policy,

inflicts the injury . . . .'" (alteration in original) (quoting *Monell*, 436 U.S. at  694)).

"Congress did not intend municipalities to be held liable [under § 1983] unless action

pursuant to official municipal policy of some nature caused a constitutional tort."  *Monell*, 436

U.S. at 691.  Thus, when bringing a claim against a municipality under § 1983 based on a public

official's acts, "a plaintiff is required to prove: (1) actions taken under color of law;

(2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an

official policy of the municipality caused the constitutional injury."  *Roe v. City of Waterbury*,

542 F.3d 31, 36 (2d Cir. 2008); *cf. Salvatierra v. Connolly*, No. 09-CV-3722, 2010 WL 5480756,

at *10 (S.D.N.Y. Sept. 1, 2010) (dismissing a claim against agencies where the plaintiff did not

allege that any policy or custom caused the deprivation of his rights), *adopted by* 2011 WL 9398

(S.D.N.Y. Jan. 3, 2011); *Arnold v. Westchester Cty.*, No. 09-CV-3727, 2010 WL 3397375, at *9

(S.D.N.Y. Apr. 16, 2010) (recommending dismissing a claim against the county because the

complaint "[did] not allege the existence of an unconstitutional custom or policy"), *adopted sub*

*nom. Arnold v. Westchester Cty. Dep't of Corr.*, No. 09-CV-3727, 2010 WL 3397372 (S.D.N.Y.

Aug. 25, 2010).  The fifth element reflects the notion that "a municipality may not be held liable

under § 1983 solely because it employs a tortfeasor."  *See Bd. of Cty. Comm'rs v. Brown*, 520

U.S. 397, 403 (1997); *see also Newton v. City of New York*, 566 F. Supp. 2d 256, 270 (S.D.N.Y.

2008) ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may

only be held liable when the municipality itself deprives an individual of a constitutional right.").

In other words, a municipality may not be liable under § 1983 "by application of the doctrine of

respondeat superior."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (italics omitted);

*see also Vassallo v. Lando*, 591 F. Supp. 2d 172, 201 (E.D.N.Y. 2008) (noting that "a municipal

entity may only be held liable where the entity *itself* commits a wrong").  Instead, there must be a

"direct causal link between a municipal policy or custom and the alleged constitutional

deprivation."  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also City of St. Louis v.

Praprotnik*, 485 U.S. 112, 122 (1988) ("[G]overnmental bodies can act only through natural

persons, . . . [and] governments should be held responsible when, and only when, their official

policies cause their employees to violate another person's constitutional rights.").

     "In determining municipal liability, it is necessary to conduct a separate inquiry into

whether there exists a 'policy' or 'custom.'"  *Davis v. City of New York*, 228 F. Supp. 2d 327,

336 (S.D.N.Y. 2002), *aff'd*, 75 F. App'x 827 (2d Cir. 2003).  A plaintiff may satisfy the "policy

or custom" requirement by alleging the existence of:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by
> government officials responsible for establishing the municipal policies that caused
> the particular deprivation in question; (3) a practice so consistent and widespread
> that, although not expressly authorized, constitutes a custom or usage of which a
> supervising policy-maker must have been aware; or (4) a failure by policymakers
> to provide adequate training or supervision to subordinates to such an extent that it
> amounts to deliberate indifference to the rights of those who come into contact with
> the municipal employees.

*See Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations

omitted).

     Normally, "a custom or policy cannot be shown by pointing to a single instance of

unconstitutional conduct by a mere employee of the [municipality]."  *See Newton*, 566 F. Supp.

2d at 271; *see also City of Okla. v. Tuttle*, 471 U.S. 808, 823–24 (1985) (plurality opinion)

("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under

*Monell*, unless proof of the incident includes proof that it was caused by an existing,

unconstitutional municipal policy, which policy can be attributed to a municipal policymaker.");

*Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation.").  In the end, therefore, "a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury."  *Roe*, 542 F.3d at 37 (quoting *Brown*, 520 U.S. at 404); *see also Tuttle*, 471 U.S. at 824 n.8 (plurality opinion) ("The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell's* requirement that the particular policy be the 'moving force' behind a *constitutional* violation.  There must at least be an affirmative link between[, for example,] the training inadequacies alleged, and the particular constitutional violation at issue."); *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ("Absent a showing of a causal link between an official policy or custom and the plaintiffs' injury, *Monell* prohibits a finding of liability against the [c]ity."); *Johnson v. City of New York*, No. 06-CV-9426, 2011 WL 666161, at *3 (S.D.N.Y. Feb. 15, 2011) (noting that after demonstrating the existence of a municipal policy or custom, "a plaintiff must establish a causal connection—an affirmative link—between the policy and the deprivation of his constitutional rights" (internal quotation marks omitted)).

At this stage, of course, Plaintiff need not prove these elements, but still must plead them sufficiently to make out a plausible claim for relief.  Although there is no heightened pleading requirement for complaints alleging municipal liability under § 1983, *see Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 168 (1993), a complaint does not "suffice if it tenders naked assertion[s] devoid of further factual enhancement," *Iqbal,* 556 U.S. at 678 (alteration in original) (internal quotation marks omitted).  Thus, to survive a motion to dismiss, Plaintiff cannot, through conclusory allegations, merely assert the existence of a

municipal policy or custom, but "must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists." *Santos v. New York City*, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012). Put another way, mere allegations of a municipal custom, a practice of tolerating official misconduct, or inadequate training and/or supervision are insufficient to demonstrate the existence of such a custom unless supported by factual details.

Plaintiff's Complaint exclusively contains boilerplate language echoing the requirements in *Monell*. Plaintiff's allegations with respect to the School District are the following: Plaintiff alleges that there is an "indiscriminate strip-search policy," (*see* Compl. ¶ 8), and she states that:

> [t]he §1983 and other federal claims are also asserted against the Defendant School District to the extent that the deprivation of rights complained of was either pursuant to an actual policy of the Defendant School District, or became an actual and/or de facto policy of the Defendant School District and the individual Defendants and/or were undertaken and enacted by the top policy makers of the Defendant School District.

(*Id.* ¶15(f).) Plaintiff also asserts that:

> [u]pon information and belief, the source of which is the School District's attorney's failure to indicate whether any disciplinary action has been taken against the individual Defendants, Defendant School District has neither disciplined any of the Individual Defendants for their clearly unconstitutional and tortious conduct, nor put in place policies to avert future constitutional violations.

(*Id.* ¶ 42.) Finally, Plaintiff alleges that, "[d]uring all times relevant hereto, Defendant School District, its agents and employees, developed and maintained policies and/or customs exhibiting deliberate indifference to the Constitutional rights of Plaintiff and other students similarly situated, which caused a violation of Plaintiffs Fifth and Fourteenth Amendment rights." (*Id.* ¶ 48; *see also id.* ¶ 54 (same).)

These general allegations are "conclusory, and therefore must be disregarded." *Simms v. City of New York,* No. 10-CV-3420, 2011 WL 4543051, at *3 (E.D.N.Y. Sept. 28, 2011) (citing *Iqbal,* 556 U.S. at 678–79) (dismissing conclusory allegations that did not provide any facts that

would allow the court to infer what city policies or practices led to the alleged deficiency), *aff'd,* 480 F. App'x. 627 (2d Cir. 2012); *see also Triano v. Town of Harrison*, 895 F. Supp. 2d 526, 535–36 (S.D.N.Y. 2012) (noting that "mere allegations of a municipal custom or practice of tolerating official misconduct are insufficient to demonstrate the existence of such a custom unless supported by factual details" and collecting cases); *Duncan v. City of New York,* No. 11-CV-3826, 2012 WL 1672929, at *2–*3 (E.D.N.Y. May 14, 2012) (holding that "boilerplate statements" claiming that New York City had a custom of making and tolerating false arrests and of using excessive force "[were] insufficient to state a claim of municipal liability under *Monell*"); *Moore v. City of New York,* No. 08-CV-8879, 2010 WL 742981, at *6 (S.D.N.Y. Mar. 2, 2010) ("Allegations that a defendant acted pursuant to a policy or custom without any facts suggesting the policy's existence, are plainly insufficient." (internal quotation marks omitted)); *Bradley v. City of New York,* No. 08-CV-1106, 2009 WL 1703237, at *3 (E.D.N.Y. June 18, 2009) ("The [c]omplaint's conclusory, boilerplate language—that the [c]ity 'failed to adequately train, discipline, and supervise' employees and 'failed to promulgate and put into effect appropriate rules and regulations applicable to the duties and behavior' of its employees—is insufficient to raise an inference of the existence of a custom or policy, let alone that such a policy caused [the] [p]laintiff to be arrested without probable cause." (brackets and citation omitted)).  Therefore, Plaintiff's § 1983 claims against the School District are dismissed.

### 5.  State Tort Claims

Plaintiff asserts several claims under state law: a claim under Article I, § 12 of the New York State Constitution (Claim Four), a claim under Article I, § 6 of the New York State Constitution (Claim Five), an assault and battery claim (Claim Six), a false imprisonment claim (Claim Seven), an intentional infliction of emotional distress claim (Claim Eight), a negligent

infliction of emotional distress claim (Claim Nine), and a prima facie tort claim (Claim Ten).
(*See* Compl. ¶¶ 61–105.)

The Court has "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." *See* 28 U.S.C. § 1367(a). "Claims are part of the same case or controversy if they derive from a common nucleus of operative fact[s]." *SAT Int'l Corp. v. Great White Fleet (US) Ltd.*, No. 03-CV-7481, 2006 WL 661042, at *5 (S.D.N.Y. Mar. 16, 2006). Here, Plaintiff's state and federal claims arise out of a common nucleus of operative facts, namely the search of Plaintiff. Nevertheless, because the Court dismisses Plaintiff's § 1983 claims against Defendants, "it is within [the Court's] discretion whether to exercise supplemental jurisdiction over [P]laintiff's state law claims." *Rosato v. N.Y. Cty. Dist. Attorney's Office*, No. 09-CV-3742, 2009 WL 4790849, at *4 (S.D.N.Y. Dec. 14, 2009). "It is well settled that where, as here, the federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims." *Klein & Co. Futures, Inc. v. Bd. of Trade*, 464 F.3d 255, 262 (2d Cir. 2006). Accordingly, the Court declines to exercise jurisdiction over Plaintiff's state law claims against Defendants, and dismisses these claims without prejudice.

### III.  Conclusion

For the foregoing reasons, Defendants' Motion To Dismiss is granted without prejudice.

Plaintiff may file an amended complaint within 30 days of the date of this Opinion.  The Clerk of

the Court is respectfully requested to terminate the pending Motion.  (*See* Dkt. No. 12.)

 SO ORDERED.

Dated:         September 30 , 2015
               White Plains, New York

                                              KENNETH M. KARAS
                                              UNITED STATES DISTRICT JUDGE

31