UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

TRACY MASCIOTTA, as the parent and guardian of
V.M.,

                Plaintiff,

     -v-

THE CLARKSTOWN CENTRAL SCHOOL
DISTRICT, CAROL NAPIER, SUSAN GOLD, and
MARY KAY HUMENN,

              Defendants.

---

Case No. 14-CV-7128 (KMK)

OPINION & ORDER

Appearances:

Joseph Raphael DeMatteo, Esq.
Jeffrey Lawrence Bernfeld, Esq.
Bernfeld, DeMatteo & Bernfeld, LLP
New York, NY
*Counsel for Plaintiff*

Adam I. Kleinberg, Esq.
Sokoloff Stern LLP
Carle Place, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

      Tracy Masciotta has brought this Action as the parent and guardian of V.M. ("Plaintiff")

under 42 U.S.C. § 1983 and New York state law, alleging that Carol Napier ("Napier"), Susan

Gold ("Gold"), Mary Kay Humenn ("Humenn") (collectively, the "Individual Defendants"), and

the Clarkstown Central School District (the "School District") (collectively, "Defendants"),

violated the United States Constitution and the New York State Constitution and committed a

number of state common law torts.  Defendants move to dismiss all claims.  For the following

reasons, Defendants' Motion To Dismiss is granted.

<u>I.  Background</u>

<u>A.  Factual Background</u>

The following facts are taken from Plaintiff's Amended Complaint and are presumed to

be true for the purposes of this Motion.  Plaintiff, at all relevant times, was a minor and a student

at Clarkstown North High School, which is part of the Clarkstown Central School District.  (Am.

Compl. ¶ 1 (Dkt. No. 26).)  At the time of the events giving rise to the Amended Complaint,

Napier was a school psychiatrist employed by the School District; Gold was a social worker

employed by the School District; and Humenn was a registered nurse employed by the School

District.  (*Id.* ¶¶ 3–5.)

On December 9, 2013, Plaintiff reported to Napier's office "to complete a scheduled

test."  (*Id.* ¶ 17.)  Upon entering Napier's office, Plaintiff "observed that [D.H.], who is a fellow

student and friend" was in the office.  (*Id.* ¶ 18.)  Plaintiff asked why D.H. was there.  (*Id.* ¶ 19.)

Napier responded that D.H. "was on her schedule and that it [was] difficult to explain" and told

Plaintiff to leave.  (*Id.*)  Plaintiff left the office and later received a phone call from D.H., who

told her that Napier "was questioning him about a purported cut on Plaintiff's leg," and that

Napier believed Plaintiff had shown D.H. this cut, but that he "denied that he had ever seen such

a cut, or knew anything about it."  (*Id.* ¶¶ 20–21.)  Although D.H. had never seen the cut on

Plaintiff's leg, had not been told there was such a cut on Plaintiff's leg, and told Napier that he

had no knowledge of such a cut or any other injury, Napier was nevertheless "insistent that

[D.H.] had the seen the purported cut."  (*Id.* ¶¶ 21–22.)

While Plaintiff was still talking with D.H., Gold approached Plaintiff, told her that she

had been looking for her, and "gestured for Plaintiff to accompany her to the Nurse's Office."

(*Id.* ¶ 23.)  When they arrived at the Nurse's Office, Humenn was present, and Gold informed

Plaintiff and Humenn "that they were present in the Nurse's Office because there exist[ed] a carving of a cat on Plaintiff's leg and it need[ed] to be checked." (*Id.* ¶¶ 24–25.) Plaintiff replied, "No, I don't." (*Id.* ¶ 26 (internal quotation marks omitted).) Gold told her that she had to, even though (1) Plaintiff showed no signs of injury or discomfort, was not bleeding, and had no blood on her clothing, (2) Defendants had neither seen a picture of the cut nor had been told by D.H. that he had seen the cut or its picture, and (3) neither Gold nor Humenn asked Plaintiff if she had cut herself or about her general health. (*Id.* ¶¶ 26–27.) "Despite there being an unoccupied medical examination room in the Nurse's Office," Humenn "directed Plaintiff into a small storage closest" in the Nurse's Office, which was not "outfitted for any type of medical examination." (*Id.* ¶ 28.)[1] Once Plaintiff and Humenn entered the closet, Humenn closed the door, but did not ask Plaintiff whether she had cut herself or otherwise suffered any injury. (*Id.* ¶ 29.) "Plaintiff inquired as to what to do, and . . . Humenn directed Plaintiff to pull her pants down." (*Id.* ¶ 30.) Plaintiff "lowered her pants to approximately knee level," and Humenn told her to "lower her pants to . . . her ankles"; Plaintiff complied. (*Id.*) Humenn "inspected Plaintiff's legs," but did not find any cuts or bruises. (*Id.*) Humenn also "directed Plaintiff to lift up [her] shirt." (*Id.* ¶ 31.) Plaintiff "lift[ed] her shirt up just beneath her brassiere"; however, Humenn "indicated that sometimes girls cut themselves in the area of their breasts, and directed Plaintiff to lift the shirt over her brassiere." (*Id.*) Plaintiff complied, and Humenn "inspected the front of Plaintiff's torso," then walked behind Plaintiff, "lifted the shirt up Plaintiff's back, and

---

[1] Plaintiff also alleges that the closet was not "the proper setting for a medical examination," and concludes that it is therefore "clear that the examination was not conducted for any medical purpose." (Am. Compl. ¶ 28.) These are, however, legal conclusions at best, and the Court need not accept the truth of such statements upon a motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

3

inspected Plaintiff's back." (*Id.* ¶¶ 31–32.)  Humenn "found no cuts, bruises[,] or unusual marks on Plaintiff's body," and Plaintiff was permitted to exit the closet.  (*Id.* ¶ 33.)[2]

When Plaintiff exited the closet into the Nurse's Office, Gold was present and on the phone with Napier.  (*Id.* ¶ 34.)  Gold handed Plaintiff the telephone, (*id.*), and Napier told Plaintiff that she was "not being truthful about cutting herself, and urged Plaintiff to tell the truth, falsely claiming that [D.H.] had told . . . Napier that Plaintiff showed [D.H.] the purported cut on Plaintiff's leg," (*id.* ¶ 35 (internal quotations omitted).)  Plaintiff stated that "she had no marks on her and had never shown [D.H.] her leg, or any purported cut on her leg." (*Id.*)  After the phone conversation, Humenn said, "I need to go through your phone," and Plaintiff replied, "No, you don't."  (*Id.* ¶ 36 (internal quotation marks omitted).)[3]  Humenn "then searched through Plaintiff's phone[], looking at Plaintiff's Instagram account, Facebook account, and all of her photo albums, before returning the phone to Plaintiff."  (*Id.* ¶ 37.)  This search also "did not reveal any evidence of self-cutting."  (*Id.* ¶ 38.)  Gold then called School Police Officer Matthew Barry and told him that Plaintiff "had carved a cat into her leg and that the carving was seen in an Instagram photo, but that the search did not reveal any evidence of the carving."  (*Id.* ¶ 39.)[4] Plaintiff "spoke briefly on the telephone with Officer Barry and was then permitted to leave the

---

[2] Plaintiff claims that "Gold and Napier directed the strip search of Plaintiff," but she admits this allegation is based on "the circumstances leading to the strip search of Plaintiff." (Am. Compl. ¶ 79.)

[3] Plaintiff also alleges that, "[h]aving not discovered any cut on Plaintiff, there was no medical reason to search Plaintiff's phone."  (Am. Compl. ¶ 36.)  This, too, however, is a legal conclusion, which need not be taken as true.

[4] Plaintiff alleges that "calling the police is not a hallmark of a purported medical examination, but rather [is] more consistent with a criminal investigation."  (Am. Compl. ¶ 39.) This is, too, is, at best, a legal conclusion.

Nurse's Office."  (*Id.* ¶ 40.)  Plaintiff "exited the office and ran out of the school building in tears."  (*Id.* ¶ 41.)

According to Plaintiff, "[a]t no point prior to the search of Plaintiff[] did any of the Individual Defendants, or any employee of the [School District], contact Plaintiff's parents to either discuss the purported cutting, or to obtain permission to conduct the . . . strip-search of Plaintiff and search of Plaintiff's telephone."  (*Id.* ¶ 42.)[5]  Additionally, Plaintiff alleges upon information and belief that the School District "has neither disciplined any of the Individual Defendants for their clearly unconstitutional and tortious conduct, nor put in place policies to avert future constitutional violations."  (*Id.* ¶ 46.)

As a result, according to Plaintiff, she has "suffered mental anguish resulting in depression, loss of appetite, loss of sleep, nightmares, stomach pains, panic attacks, fear of closed spaces, fear of authority figures and discomfort at school," as well as "public humiliation and stigma."  (*Id.* ¶¶ 44–45; *see also id.* ¶ 95 ("As a direct result of the Defendants['] actions, the Plaintiff was made to suffer extreme emotional and psychological damages.").)

From these factual allegations, Plaintiff asserts ten causes of action, each of which is asserted against all Defendants: (1) substantive deprivation and conspiracy to deprive Plaintiff of her constitutional rights under § 1983; (2) a violation of her Fourth Amendment right to be free of unreasonable searches and seizures; (3) a violation of her Fifth Amendment right to Due

---

[5] Plaintiff alleges that "[t]he foregoing facts demonstrate that the search of Plaintiff and her telephone was not undertaken due to any legitimate concern for Plaintiff's well[-]being, but rather was conducted in bad faith in order to harass Plaintiff."  (*Id.* ¶ 43.)  To the contrary, according to Plaintiff, "[h]ad there been a legitimate concern for Plaintiff's well[-]being, a proper inquiry would have been made of Plaintiff and her parents would have been contacted before any search was conducted," and "Defendants' communication with the School Police officer also shows that the search was not undertaken for any legitimate medical purpose."  (*Id.*)  Again, these are legal conclusions, which this Court need not assume true.

Process; (4) a violation of her New York State constitutional right to be free of unreasonable searches and seizures; (5) a violation of her New York State constitutional right to Due Process; (6) assault and battery; (7) false imprisonment; (8) intentional infliction of emotional distress; (9) negligent infliction of emotional distress; and (10) prima facie tort.  (*Id.* ¶¶ 48–109.)

     B.  Procedural Background

     On March 5, 2014, Plaintiff served a Notice of Claim on the Town of Clarkstown.  (*See* Decl. of Anthony F. Cardoso in Supp. of Defs.' Mot. To Dismiss ("Cardoso Decl.") Ex. B (Dkt. No. 13).)  Plaintiff filed the Complaint in this case on September 4, 2014.  (Dkt. No. 1.) Pursuant to a scheduling order entered by the Court, (Dkt. No. 11), and amended at the request of the Parties, (Dkt. No. 16), Defendants filed their Motion To Dismiss and accompanying papers on January 9, 2015, (Dkt. Nos. 12–14); Plaintiff filed her Opposition on February 13, 2015, (Dkt. No. 17); and Defendants filed their Reply on February 27, 2015, (Dkt. No. 18).  On May 19, 2015, the Court ordered the Parties to submit supplemental briefing on three issues: whether the Court could consider the Notice of Claim, whether the Motion based on the adequacy of the Notice of Claim was properly considered a motion under Rule 12(b)(1) or Rule 12(b)(6), and whether the Notice of Claim sufficiently sets forth "the time when, the place where and the manner in which the claim arose," as required by N.Y. Gen. Mun. L. § 50-e, and otherwise complied with any other requirement pertaining to notices of claim under New York state law. (*See* Dkt. No. 19.)  In response, Defendants and Plaintiff submitted the requested briefing on May 26, 2015, and May 28, 2015, respectively.  (*See* Dkt. Nos. 20, 23.)  On September 30, 2015, the Court issued an Opinion and Order dismissing Plaintiff's claims but granting her leave to file an Amended Complaint, (*see* Dkt. No. 24), which she did on November 4, 2015.  After a pre-motion conference, (*see* Dkt. (minute entry for Dec. 15, 2015)), Defendants moved to

dismiss the Amended Complaint on January 14, 2016, (*see* Dkt. Nos. 31–33); Plaintiff responded

on February 12, 2016, (*see* Dkt. No. 34), and Defendants replied in support of their Motion on

February 26, 2016, (*see* Dkt. No. 35).

## II.  Discussion

### A.  Standard of Review

Defendants move to dismiss Plaintiff's Complaint under Rule 12(b)(6) of the Federal

Rules of Civil Procedure.  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss

does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his

entitlement to relief requires more than labels and conclusions . . . ."  *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 555, (2007) (brackets, citations, and internal quotation marks omitted).  "[A]

formulaic recitation of the elements of a cause of action will not do."  *Id.*  Rule 8 of the Federal

Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-

me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it

tenders naked assertions devoid of further factual enhancement."  *Id.* (internal quotation marks

and brackets omitted).  Instead, a complaint's "[f]actual allegations must be enough to raise a

right to relief above the speculative level . . . ."  *Twombly*, 550 U.S. at 555.  Although "once a

claim has been stated adequately, it may be supported by showing any set of facts consistent with

the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to

state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or

her] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed,"

*id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim

for relief will . . . be a context-specific task that requires the reviewing court to draw on its

judicial experience and common sense.  But where the well-pleaded facts do not permit the court

to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) ("In addressing the sufficiency of a complaint we accept as true all factual allegations . . . ." (internal quotation marks omitted)). Further, "[f]or the purpose of resolving [a] motion to dismiss, the [c]ourt . . . draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

"In ruling on a 12(b)(6) motion, . . . a court may consider the complaint as well as any written instrument attached to the complaint as an exhibit or any statements or documents incorporated in it by reference," as well as "matters of which judicial notice may be taken, and documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Kalyanaram v. Am. Ass'n of Univ. Professors at N.Y. Inst. of Tech., Inc.*, 742 F.3d 42, 44 n.1 (2d Cir.) (brackets and internal quotation marks omitted), *cert. denied*, 135 S. Ct. 677 (2014); *see also Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) ("In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the

complaint by reference, and to matters of which judicial notice may be taken." (internal quotation marks omitted)); *Hendrix v. City of New York*, No. 12-CV-5011, 2013 WL 6835168, at *2 (E.D.N.Y. Dec. 20, 2013) (same).

B.  Discussion

Defendants move to dismiss on a variety of grounds; however, for the reasons that follow, three are dispositive of Plaintiff's federal claims.  The Court therefore addresses each in turn.

1.  Law of the Case

To begin, Plaintiff's claims for violations of her Fourth Amendment rights are barred by the law-of-the-case doctrine.  Under that doctrine, "a decision on an issue of law becomes binding precedent in subsequent stages of the same litigation." *Brentwood Pain & Rehab. Servs., P.C. v. Allstate Ins. Co.*, 508 F. Supp. 2d 278, 288 (S.D.N.Y. 2007) (citing *In re PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991)); *see also Musacchio v. United States*, 136 S. Ct. 709, 716 (2016) ("The law-of-the-case doctrine generally provides that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." (internal quotation marks omitted)); *United States v. Plugh*, 648 F.3d 118, 123 (2d Cir. 2011) (explaining that "[a]s a general matter . . . [a court should] adhere to its own decision at an earlier stage of the litigation" (internal quotation marks omitted)).  This doctrine "only forecloses consideration of issues that have already been decided," *U.S. Bank Nat'l Ass'n ex rel. Lima Acquisition LP v. PHL Variable Ins. Co.*, No. 12-CV-6811, 2014 WL 998358, at *4 (S.D.N.Y. Mar. 14, 2014) (internal quotation marks omitted), and is "discretionary" such that it "does not limit a court's power to reconsider its own decisions prior to final judgment," *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 8 (2d Cir. 1996) (internal quotation marks

omitted); *see also Musacchio*, 136 S. Ct. at 716 ("The [law-of-the-case] doctrine expresses the practice of courts generally to refuse to reopen what has been decided, but it does not limit courts' power." (alteration and internal quotation marks omitted)).  However, a court should be "loathe to revisit an earlier decision in the absence of extraordinary circumstances," *N. River Ins. Co. v. Phila. Reins. Corp.*, 63 F.3d 160, 165 (2d Cir. 1995) (internal quotation marks omitted); *see also Bergerson v. N.Y. State Office of Mental Health, Cent. N.Y. Psychiatric Ctr.*, 652 F.3d 277, 288 (2d Cir. 2011) (noting that "there is a strong presumption against amendment of prior orders"), namely "cogent or compelling reasons not to [follow the earlier decision], such as an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice," *Bellezza v. Holland*, No. 09-CV-8434, 2011 WL 2848141, at *3 (S.D.N.Y. July 12, 2011) (internal quotation marks omitted); *see also Plugh*, 648 F.3d at 123–24 (same); *cf. Benavidez v. Piramides Mayas Inc.*, No. 09-CV-5076, 2013 WL 2357527, at *3–4 (S.D.N.Y. May 24, 2013) (explaining that the court "found a compelling reason" to vacate its prior order under this standard, namely "[m]anifest injustice"); *Pineiro v. Pension Benefit Guar. Corp.*, No. 96-CV-7392, 1999 WL 195131, at *2 (S.D.N.Y. Apr. 7, 1999) (noting that "the amended complaint and its attached material have prompted a fresh look at the statute" at issue).

To understand whether the law-of-the-case doctrine is an impediment to Plaintiff's claim in its current form, it is instructive to revisit briefly the Court's earlier holding: In its prior Opinion, the Court determined that the Individual Defendants are qualifiedly immune from liability on Plaintiff's Fourth Amendment claim, reasoning that "the Court [could not] say that Defendants' conduct violated Plaintiff's clearly established constitutional right because it was not clearly established that Defendants' actions were even covered by the Fourth Amendment."

10

(Op. & Order 15–16, 18 (Dkt. No. 24).)  That was so because, "[a]s alleged by Plaintiff, the searches . . . were done for medical purposes," (*id.* at 11), and because "Defendants did not have fair warning that their search of Plaintiff for medical purposes violated Plaintiff's Fourth Amendment rights," (*id.* at 18).  In so doing, the Court informed Plaintiff that her "[Fourth Amendment] claim [could] be revived in an amended complaint if, for example, Plaintiff [were to] allege[] facts tending to show that the search was done for non-medical purposes, for example, to look for evidence of violation of school rules or for contraband."  (*Id.* at 18 n.11.)

At this stage of the litigation, the Parties' dispute surrounding the law-of-the-case doctrine boils down to the question of whether Plaintiff, in fact, amended her initial Complaint to such an extent that the Court's prior Fourth Amendment and substantive due process holdings no longer suffice to resolve the instant Motion.  For their part, Defendants argue that Plaintiff in her Amended Complaint merely "echoes the same allegations the Court already rejected, i.e. that the medical search was not justified," and that the "new allegations continue to question the defendants' justification not their purpose."  (Mem. of Law in Supp. of Defs.' Mot. To Dismiss 7 (Dkt. No. 33).)  In her Opposition, as Defendants correctly point out, (*see* Reply Mem. of Law in Supp. of Defs.' Mot. To Dismiss ("Defs.' Reply") 2 (Dkt. No. 35)), Plaintiff does not argue directly that the law-of-the-case doctrine does not apply, (*see generally* Pl.'s Mem. of Law in Opp'n to Defs.' Mot. To Dismiss the Am. Compl. ("Pl.'s Opp'n") (Dkt. No. 34)), but rather insists that "[a] simple reading of the Amended Complaint reveals that factual additions were made throughout the Amended Complaint," specifically paragraphs 7, 8, 22, 26–29, 31–32, 35–36, 39, 43, 56, and 67.  (Pl.'s Opp'n 1.)[6]

---

[6] For sake of thoroughness, the Court notes that Plaintiff's Amended Complaint also makes other small changes as well—for instance, amending paragraph nine to characterize

A review of those paragraphs and, indeed, the Amended Complaint as a whole makes clear that the changes Plaintiff made can be distilled into the following general categories:

- That Plaintiff had not been bleeding and did not show signs of injury, discomfort, or other medical exigency.  (Am. Compl. ¶¶ 7, 26.)

- That Defendants, knowing Plaintiff did not cut herself, accused her of having done so, claiming that she needed to be "checked," even though Defendants had no reason to believe that Plaintiff had been injured or cut and even though Defendants did not ask Plaintiff about her health, whether she had cut herself, or whether she sustained any injury.  (Am. Compl. ¶¶ 8, 27, 29, 31–32, 35.)

- That Defendants harassed Plaintiff, acting in bad faith and without medical purpose.  (Am. Compl. ¶¶ 8, 32, 36, 39, 43, 56(d); 67(d).)

- That Defendants' decision to contact the police shows the investigation was either for non-medical or investigatory purposes.  (Am. Compl. ¶¶ 39, 43.)

- That Defendants did not provide Plaintiff's parents any prior notice.  (Am. Compl. ¶¶ 7–9, 43.)[7]

- That D.H. had not seen or heard of—nor did he tell Napier that he had seen or knew of—a cut on Plaintiff's leg.  (*See* Am. Compl. ¶¶ 22, 26, 35.)

- That the closet where Plaintiff was inspected was an improper location for a medical examination and did not afford sufficient privacy, despite there being an unoccupied medical examination room in the nurse's office.  (Am. Compl. ¶ 28.)

In her Opposition, Plaintiff makes clear the purpose for these changes: That is, to demonstrate that Defendants' actions were taken for non-medical reasons.  (*See, e.g.*, Pl.'s Opp'n 6 ("In sum, the circumstances surrounding the strip search of [Plaintiff], as set forth in the

_____

Defendants' purported "strip-search policy" as not merely "indiscriminate," but, now, "bad faith and harassing" as well.  (*Compare* Compl. ¶ 8 (Dkt. No. 1), *with* Am. Compl. ¶ 9.)

[7] This allegation appeared in the original complaint, (*see, e.g.*, Compl. ¶ 7); however, it looks as though Plaintiff's new recitations of this fact in the Amended Complaint are intended to make the allegation that, by failing to do so, Defendants demonstrated that they acted without a legitimate purpose, (*see, e.g.*, Am. Compl. ¶ 43 ("Had there been a legitimate concern for Plaintiff's well[-]being, a proper inquiry would have been made of Plaintiff and her parents would have been contacted before any search was conducted.")).

Amended Complaint, demonstrate that the search was not performed for medical purposes, but rather had the earmarks of an investigatory search aimed at harassing and/or disciplining [Plaintiff], or otherwise furthering the investigatory and administrative function of the School District.").)  These changes are, however, insufficient for two reasons: First, they are, in large part, mere legal conclusions, and, second, even if the Court were to conclude that the disputed searches were decidedly non-medical, the law-of-the-case doctrine still defeats Plaintiff's claim as asserted in the Amended Complaint.

With respect to the former, as recognized, it is fundamental that "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  *Iqbal*, 556 U.S. at 679.  Indeed, where a plaintiff's allegations amount to "no more than legal conclusions," they are "not entitled to the assumption of truth."  *Id.*  This principle renders impotent, for instance, Plaintiff's assertion that "calling the police is . . . more consistent with a criminal investigation" than "a purported medical examination."  (Am. Compl. ¶ 39.) While that proposition may or may not be true, this Court need not—and, therefore, does not— presume that it is.  *See Iqbal*, 556 U.S. at 81 (noting that the "conclusory nature of [a plaintiff's] allegations . . . disentitles them to the presumption of truth").  Once that principle is applied to the Amended Complaint, it follows that such allegations are insufficient to "show that the search was done for non-medical purposes, for example, to look for evidence of violation of school rules or for contraband."  (Op. & Order 18 n.11.)  And while Plaintiff does adduce some factual support for these conclusions—generally, that she did not show signs of injury, (Am. Compl. ¶¶ 7, 26), that Defendants contacted the police but not Plaintiff's parents, (*id.* ¶¶ 7–9, 39, 43), that D.H. did not tell Napier that he knew of a cut on Plaintiff's leg, (*id.* ¶¶ 22, 26, 35), and that Plaintiff was searched not in a medical examination room but in a closet, (*id.* ¶ 28)—such facts,

many of which appeared in the original complaint (even if pressed with greater force in the Amended Complaint), do not "nudge[] the[] claims across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570, particularly because the insinuation that the search was undertaken for non-medical purposes runs headlong into the fact that, as alleged, the police were called *after* the search at issue, (*see* Am. Compl. ¶ 40 ("Plaintiff spoke briefly on the telephone with Officer Barry and was then permitted to leave the Nurse's Office.")).

But more generally, even if those facts did also "demonstrate that the search of Plaintiff and her telephone was not undertaken due to any legitimate concern for Plaintiff's well[-]being, but rather was conducted in bad faith in order to harass Plaintiff," (Am. Compl. ¶ 43), the law-of-the-case doctrine *still* would defeat Plaintiff's Fourth Amendment claims.  Indeed, while the Court informed Plaintiff that her "[Fourth Amendment] claim may be revived in an amended complaint if, for example, [she] alleges facts tending to show that the search was done for non-medical purposes," (Op. & Order 18 n.11), the Court did not do so on the logic that *any* non-medical purpose would ipso facto state a Fourth Amendment claim.  Rather, the Court surveyed the applicable case law that, collectively, stood for the proposition that, "[g]enerally speaking, the Fourth Amendment applies when the 'objectionable conduct occurred [in the context] of a criminal investigation or other form of governmental investigation or activity,'" (*id.* at 13 (second alteration in original) (quoting *Poe v. Leonard*, 282 F.3d 123, 136 (2d Cir. 2002))), before concluding that it could not "say that Defendants' conduct violated Plaintiff's clearly established constitutional right because it was not clearly established that Defendants' actions were even covered by the Fourth Amendment," (*id.* at 15–16).  Plainly, the universe of non-medical searches is not coterminous with that of investigatory searches.  In other words, the law-of-the-case doctrine presents an obstacle unless Plaintiff has alleged facts sufficient to

14

conclude that the searches, more than being non-medical, in fact, occurred in the context of a "criminal investigation or other form of governmental investigation or activity." *Poe*, 282 F.3d at 136. That, she has not done. To the contrary, Plaintiff's revised allegations emphasize the allegedly bad faith nature of the searches, (*see, e.g.*, Am. Comp. ¶ 43 (asserting that the searches were "conducted in bad faith in order to harass Plaintiff")), and, in so doing, lie—like medical searches—beyond the ramparts of the Fourth Amendment. *Cf. Doe v. Luzerne County*, 660 F.3d 169, 171–72, 179 (3d Cir. 2011) (concluding that videotaping a female deputy sheriff in a "large open showering room" "for personal reasons and outside the scope of a governmental investigation" did not "implicate the Fourth Amendment"); *Poe*, 282 F.3d at 137 (finding that the "surreptitious videotaping" of a woman by a state trooper was "for . . . personal reasons" and that the Fourth Amendment therefore "simply [was] not implicated by his misconduct").[8]

---

[8] In her Opposition, Plaintiff makes liberal use of words like "investigatory." (*See* Pl.'s Opp'n 1 ("[T]he strip search . . . was undertaken to investigate and harass [Plaintiff]."); *id.* at 2 ("[A] strip search conducted for investigatory purposes without sufficient justification, as was the case here, is illegal."); *id.* at 6 ("[T]he circumstances surrounding the strip search . . . , demonstrate that the search . . . had the earmarks of an investigatory search aimed at harassing and/or disciplining [Plaintiff], or otherwise furthering the investigatory and administrative function of the School District.").) To the extent these assertions find support in the Amended Complaint, (*cf.* Am. Compl. ¶ 39 ("[C]alling the police is not a hallmark of a purported medical examination, but rather more consistent with a criminal investigation.")), such allegations are, again, mere legal conclusions, which the Court need not credit. *See Iqbal*, 556 U.S. at 81 (noting that the "conclusory nature of [a plaintiff's] allegations . . . disentitles them to the presumption of truth").

That is not to say that the Court does not take Plaintiff at her word that she believes the searches to be investigatory: To the contrary, it suspects that her view of the facts is that there is something intrinsically investigatory afoot where a schoolgirl is summoned to talk to school officials and the police. Nevertheless, conduct does not fall within the Fourth Amendment simply because it resembles conduct that does. *See Hemphill v. Schott*, 141 F.3d 412, 416–20 (2d Cir. 1998) (concluding that a plaintiff who sued under theories of excessive force alleging that he was shot by a police officer *and* by a private citizen given a gun by a different police officer in the course of an arrest could state a Fourth Amendment claim against the first officer, because "the Supreme Court has made it clear that excessive force that is used by officers arresting a suspect ought to be characterized as invoking the protections of the Fourth Amendment," but that a claim against the second officer simply did not implicate the Fourth

Nor could Plaintiff respond that, whatever the logic of the Court's prior Opinion, its *holding* applied only to medical searches, such that "bad faith" searches are necessarily a different question.  (*Cf.* Pl.'s Opp'n 3 n.3, 5 (characterizing the Court's earlier Opinion as "conclud[ing] that Plaintiff, in [her] original complaint, alleged that the search . . . was done for medical purposes," but describing the searches in the Amended Complaint as reflecting "[a] lack of medical motivation").)  It is true that the law-of-the-case doctrine "only forecloses consideration of issues that have already been decided," *Lima Acquisition LP*, 2014 WL 998358, at *4 (internal quotation marks omitted); however, that principle does not require courts to re-answer questions already settled by the analysis contained in earlier opinions just because the question is framed differently, *see* 18B Charles Alan Wright et al., *Fed. Prac. & Proc. Juris.* § 4478 (2d ed.) ("If the analysis used to dispose of an issue before the court controls disposition of an issue that was not considered, however, the law of the case established by the analysis may control disposition of the new issue."); *see also Tonkovich v. Kan. Bd. of Regents, Univ. of Kan.*, 254 F.3d 941, 944 (10th Cir. 2001) ("[I]n light of the law of the case doctrine, it would be ludicrous to argue that we are free to construe the same aspects of [the] [p]laintiff's complaint differently than [we] did [on the plaintiff's prior appeal]*, although we address essentially the same issue.").[9]  Therefore, in light of the law-of-the-case doctrine, the Court declines to reconsider its conclusion as to Plaintiff's Fourth Amendment claim.

---

Amendment).  And if a putative search conducted for an officer's "personal reasons" do not "advance any governmental purpose," *Poe*, 282 F.3d at 137, the Court struggles to see how "bad faith" or "harass[ment]" by school officials could, (Am. Compl. ¶ 43).

   [9] To be clear, this is not a case where the Court's prior Opinion simply could have but did not decide the question at issue in this Motion to Dismiss.  *Cf. Tomasino v. Estee Lauder Cos.*, No. 13-CV-4692, 2015 WL 1470177, at *2 (E.D.N.Y. Mar. 31, 2015) ("As compared to claim preclusion, it is not enough under law of the case doctrine that the matter could have been decided in earlier proceedings." (alterations and internal quotation marks omitted)).  Rather, the

## 2.  Plaintiff's Substantive Due Process Claim

Having concluded that Plaintiff again does not state a Fourth Amendment claim, there still remains the question of whether her allegations now raise the specter of a substantive due process claim under the Fourteenth Amendment.[10]  In its last Opinion, the Court "dismisse[d] Plaintiff's substantive due process claim on qualified immunity grounds," distinguishing Plaintiff's claim from other alleged substantive due process violations on the logic that there was, in this case, "a legitimate government objective for the action: protecting the health and welfare of students for which Defendants were responsible."  (Op. & Order 22–23.)

Unlike the Fourth Amendment analysis undertaken above, where accepting Plaintiff's view that the searches were non-medical would not compel the conclusion that they were covered by the Fourth Amendment, here, such a change arguably would matter, inasmuch as a search conducted for non-medical reasons may, conceptually, be less likely to be based on the goal of protecting student health and welfare.  Therefore, the Court cannot necessarily answer the question of whether Plaintiff has stated a substantive due process claim by pointing to its prior Opinion.

---

Court's analysis *did* decide whether qualified immunity shields the Individual Defendants given the lack of clarity surrounding the Fourth Amendment's applicability to the searches at issue.  It does shield them.

[10] As Defendants observe, (*see* Defs.' Reply 2), Plaintiff did not make any arguments concerning her substantive due process claim in her Opposition, and, accordingly, abandoned the claim, *see, e.g.*, *Robinson v. Fischer*, No. 09-CV-8882, 2010 WL 5376204, at *10 (S.D.N.Y. Dec. 29, 2010) ("Federal courts have the discretion to deem a claim abandoned when a defendant moves to dismiss that claim and the plaintiff fails to address in their opposition papers defendants' arguments for dismissing such a claim . . . ."), "[h]owever, in the exercise of its discretion, the Court will not deem the claim abandoned," *Marro v. Nicholson*, No. 06-CV-6644, 2008 WL 699506, at *4 (E.D.N.Y. Mar. 12, 2008), but will dismiss it on its merits instead.

Therefore, before simply assuming that "protecting the health and welfare of students for which Defendants were responsible" remained the "legitimate government objective" behind the search, (*see* Op. & Order 22–23), the Court will consider the new allegations to the Amended Complaint to see if the same conclusion should again be reached.  Of course, in so doing, the Court tests Plaintiff's *factual* allegations, rather than her legal conclusions.  *See Iqbal*, 556 U.S. at 678.  However, before doing even that, a refresher as to the principles underlying the doctrines of qualified immunity and substantive due process is in order.

### a.  The Law of Qualified Immunity

"[T]he doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Village of Freeport v. Barrella*, 814 F.3d 594, 609 (2d Cir. 2016) (alterations and internal quotation marks omitted).  Qualified immunity "'gives government officials breathing room to make reasonable but mistaken judgments' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *City & County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (alteration in original) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).  "Qualified immunity protects public officials from civil liability only if (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Coggins v. Buonora*, 776 F.3d 108, 114 (2d Cir.) (internal quotation marks omitted), *cert. denied*, 135 S. Ct. 2335 (2015).  Determining whether qualified immunity attaches "is guided by two questions: first, whether the facts show that the defendants' conduct violated plaintiffs' . . . rights, and second, whether the right was clearly established at the time of the defendants' actions." *Golodner v. Berliner*, 770 F.3d 196, 201 (2d Cir. 2014) (alterations and

internal quotation marks omitted).[11]   "To determine whether the relevant law was clearly

established, [a court should] consider the specificity with which a right is defined, the existence

of Supreme Court or [Second Circuit] Court of Appeals case law on the subject, and the

understanding of a reasonable officer in light of preexisting law."  *Terebesi v. Torreso*, 764 F.3d

217, 231 (2d Cir. 2014) (citing *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010)), *cert. denied*,

135 S. Ct. 1842 (2015); *see also McGowan v. United States*, — F.3d —, 2016 WL 3163061, at

*3 (2d Cir. June 7, 2016) ("In making th[e] determination [as to whether law is clearly

established], [a court should] consider Supreme Court and Second Circuit precedent as it existed

at the time of the challenged conduct.").  That inquiry is not always solely dependent on Second

Circuit or Supreme Court case law however, *see Terebesi*, 764 F.3d at 231 n.12 (rejecting the

notion that, "as some decisions in th[e] [Second] Circuit have suggested, '[o]nly Supreme Court

and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding

---

[11] "There is some tension in [the Second] Circuit's cases as to whether the qualified
immunity standard is of two or three parts . . . ."  *Bailey v. Pataki*, 708 F.3d 391, 404 n.8 (2d Cir.
2013); *see also Taravella v. Town of Wolcott*, 599 F.3d 129, 136 (2d Cir. 2010) (noting the
"long-standing inconsistency in [Second Circuit] case law" that "describe[s] the qualified
immunity analysis both as a two-step process *and* as a three-step process" (Straub, J.,
dissenting)).  The difference turns on whether there is a third, independent inquiry into whether a
reasonable governmental official would understand that his or her conduct was unlawful.
*Compare, e.g.*, *Smith v. Roberson*, No. 15-CV-930, 2016 WL 1056588, at *2 (N.D.N.Y. Mar. 16,
2016) ("A defendant is entitled to qualified immunity in any of three circumstances: (1) if the
conduct attributed to him is not prohibited under federal law; (2) where the conduct is prohibited,
if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly
established at the time of the conduct; or (3) if the defendant's conduct was objectively legally
reasonable in light of the rules that were clearly established at the time it was taken"), *with
Goodine v. Suffolk Cty. Water Auth.*, No. 14-CV-4514, 2016 WL 375049, at *9 (E.D.N.Y. Jan.
29, 2016) ("When analyzing a qualified immunity defense, the [c]ourt focuses on two questions:
whether the facts make out a violation of a constitutional right and whether the right at issue was
clearly established at the time of [the] defendant's alleged misconduct." (internal quotation
marks omitted)).  That tension, however, "concern[s] whether the 'reasonable officer' inquiry is
part of step two—the 'clearly established' prong—or whether it is a separate, third step in the
analysis," *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 543
n.1 (2d Cir. 2014) (some internal quotation marks omitted), which does not matter here.

whether a right is clearly established'" (third alteration in original) (quoting *Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004))), and, "the absence of a decision by [the Second Circuit] or the Supreme Court directly addressing the right at issue will not preclude a finding that the law was clearly established so long as preexisting law clearly foreshadows a particular ruling on the issue," *McGowan*, 2016 WL 3163061, at *3 (alterations and internal quotation marks omitted).

Because qualified immunity "reflects an immunity from suit rather than a mere defense to liability . . . [,] it is appropriate to decide the issue of qualified immunity, when raised, at an early stage of the litigation, such as when deciding a pre-answer motion to dismiss." *Betts v. Shearman*, No. 12-CV-3195, 2013 WL 311124, at *4 (S.D.N.Y. Jan. 24, 2013) (internal quotation marks omitted), *aff'd*, 751 F.3d 78 (2d Cir. 2014). "[W]hen determining a motion to dismiss on qualified immunity grounds in advance of full merits discovery, the plaintiff's version of the facts is presumed to be true . . . ." *5 Borough Pawn, LLC v. City of New York*, 640 F. Supp. 2d 268, 285 (S.D.N.Y. 2009). In such cases, "the question to be answered is whether the defendant . . . , confronted with the facts as alleged by [the] plaintiff, could reasonably have believed that his actions did not violate some settled constitutional right." *Id.*

### b.  The Law of Substantive Due Process

"Substantive due process protections extend only to those interests that are 'implicit in the concept of ordered liberty,' which are rights 'so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Smith v. Hogan*, 794 F.3d 249, 255–56 (2d Cir. 2015) (quoting *Palko v. Connecticut*, 302 U.S. 319, 325 (1937), *overruled in part on other grounds by Benton v. Maryland*, 395 U.S. 784, 794 (1969)); *see also Reno v. Flores*, 507 U.S. 292, 303 (1993)).

As before, merely alleging that a defendant impaired an interest protected by substantive due process is insufficient to state a substantive due process claim; rather, the action taken by the state actor must have been "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Lombardi v. Whitman*, 485 F.3d 73, 79 (2d Cir. 2007) (internal quotation marks omitted); *see also Southerland v. City of New York*, 680 F.3d 127, 151 (2d Cir. 2012) (same); *Poe*, 282 F.3d at 139 (same). Indeed, "[t]he core protection provided by the Due Process Clause is protection against arbitrary government action," and therefore the "touchstone of due process is protection of the individual against . . . the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Poe*, 282 F.3d at 139 (alteration in original) (internal quotation marks omitted); *see also Southerland*, 680 F.3d at 151 ("Substantive due process rights safeguard persons against the government's exercise of power without any reasonable justification in the service of a legitimate governmental objective." (internal quotation marks omitted)). As noted in the last Opinion, cases where the Second Circuit has held that government behavior shocks the conscience and is not shielded by immunity involve no "reasonable justification in the service of a legitimate governmental objective." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

### c. Can the Individual Defendants Be Held Liable?

With that in mind, the Court begins the task of considering whether the Individual Defendants' conduct "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known," *Barrella*, 814 F.3d at 609 (internal quotation marks omitted), by noting that, at the very least, a colorable but hardly bulletproof argument could be made that the Individual Defendants indeed violated Plaintiff's right to substantive due process. Beyond the Court's earlier observation that there is a clearly established "right to privacy in

21

one's unclothed or partially unclothed body," *Poe*, 282 F.3d at 138–39, and a "protected liberty

interest in refusing unwanted medical treatment," *Cruzan ex rel. Cruzan v. Dir., Mo. Dep't of

Health*, 497 U.S. 261, 278 (1990), courts have also wrestled with whether an intrusive,

well-being-oriented search of a minor's person implicates the Fourteenth Amendment.  For

instance, on the one hand, the Ninth Circuit has found that the Fourteenth Amendment

guarantees children the "right to the love, comfort, and reassurance of their parents while they

are undergoing medical procedures, including examinations—particularly those . . . that are

invasive or upsetting," *Wallis v. Spencer*, 202 F.3d 1126, 1142 (9th Cir. 2000), and, indeed, with

sufficient clarity as to refuse its trespassers qualified immunity, *see Greene v. Camreta*, 588 F.3d

1011, 1037 (9th Cir. 2009) (finding that where a child was strip-searched for signs of sexual

abuse, "[the child protective services caseworker's] decision to exclude [the mother] not just

from the examination but from the entire facility where her daughter was being examined

violated the [family's] clearly established rights"), *vacated in part on other grounds*, 563 U.S.

692 (2011).  Similarly, in a case involving an invasive search of a six-year-old for medical

purposes, the Sixth Circuit, rejecting a Fourth Amendment claim, expressly declined to take a

stand on whether the "conduct [at issue] may have been actionable under a different provision of

the Constitution," *Hearring v. Sliwowski*, 712 F.3d 275, 277–78, 283 n.1 (6th Cir. 2013), an

agnosticism that, upon remand, gave way to a Fourteenth Amendment claim against the school

district of sufficient legal vigor as to proceed to trial, *see Hearring v. Sliwowski*, 806 F.3d 864,

866 (6th Cir. 2015) (noting that "[o]n remand, [the plaintiff] added a Fourteenth Amendment

claim . . . for a violation of [the daughter's] substantive due process rights because the exam was

an invasion of [the daughter's] privacy," and that "[t]he money-damages claims against the

school district—for an unconstitutional search and unconstitutional invasion of privacy—

proceeded to trial" (internal quotation marks omitted)).  But, on the other hand, a district court in the Western District of Missouri concluded that there was no substantive due process problem when a paraprofessional noticed a bruise on the buttocks of a third-grader with cerebral palsy while helping her use the restroom and subsequently brought the girl to the school counselor and school nurse to show them the bruise, which was later photographed for the principal.  *See S.L. ex rel. Lakey v. Seymour R-2 Sch. Dist.*, No. 08-CV-3105, 2009 WL 3335025, at *1, *4 (W.D. Mo. Oct. 14, 2009).  And, closer to home, the Second Circuit has held that a *parent*'s substantive due process rights are not violated by the removal of a five-year-old developmentally disabled girl from her classroom without parental consent or court order for inspection at a hospital for signs of sexual abuse, because the Second Circuit could not conclude that a "temporary separation of [the girl] from her parents in an effort to obtain assurance that she had not been abused would have been so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it *even were it accompanied by full procedural protection*."  *Tenenbaum v. Williams*, 193 F.3d 581, 591, 600 (2d Cir. 1999) (emphasis added).

In other words, the question of whether the Individual Defendants may have violated Plaintiff's right to substantive due process by asking her to partially remove her clothing for inspection of whether she harmed herself is, frankly, open to debate.  However, it is not a question that the Court must—or even should—answer.  *See Camreta*, 563 U.S. at 706–07 (acknowledging that the Supreme Court "has permitted lower courts to . . . determine whether a right exists before examining whether it was clearly established," but cautioning that, "[i]n general, courts should think hard, and then think hard again, before turning small cases into large ones" by doing so).  And, perhaps paradoxically, the difficulty of that question makes easier the question that the Court does need to answer—specifically, whether the Individual Defendants

23

"violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known."  *Barrella*, 814 F.3d at 609.  Given the lack of Supreme Court or Second Circuit case law surrounding the propriety of searching a schoolchild for signs of injury, and given the uncertainty of that area of the law more generally, the Court cannot say that the Individual Defendants "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known," *id.* at 609, on the facts of this case by searching Plaintiff.

Therefore, Plaintiff's only hope to state a Fourteenth Amendment claim, notwithstanding the protections of qualified immunity, is to show that, unlike in the last Opinion, (*see* Op. & Order 22), hers is now a case in which there was simply no legitimate government objective underlying the search, *see Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 253 (2d Cir. 2001) (finding clearly established for qualified immunity purposes the proposition that a government actor cannot "use intentionally harmful force in the absence of a legitimate and discernible government aim").  Even putting aside the *Iqbal* issues already discussed, the Amended Complaint comes up short:  Indeed, were the Court to assume that her factual allegations, as amended, bear out the contention that the Individual Defendants, this time, "were not in actuality orchestrating a medical examination," (Pl.'s Opp'n 5), there is simply no getting around a number of deemed-true facts that make clear that the actions of each Individual Defendant were consistent with a broader effort to determine whether one of the school's students had been cut—more specifically, that "Napier . . . was insistent that [D.H.] had seen [Plaintiff's] purported cut," (Am. Compl. ¶ 21), that "Gold informed Plaintiff and . . . Humenn that they were present in the Nurse's Office because there supposedly exist[ed] a carving of a cat on Plaintiff's leg," (Am. Compl. ¶ 25), and that Humenn inspected Plaintiff in a manner that would reveal the presence of cuts, bruises, or marks on Plaintiff's body, while explaining during

24

the portion of the search covering Plaintiff's torso that female students sometimes cut themselves in that area, (*see* Am. Compl. ¶¶ 31–32). These allegations—even in light of Plaintiff's revisions to the original complaint relating to Plaintiff's apparent lack of pain and the flimsiness of the grounds upon which Defendants' suspicions, in Plaintiff's view, stood—simply undermine the contention that there was a true "absence of a legitimate and discernible government aim" in the search. *Johnson*, 239 F.3d at 253; *see also Poe*, 282 F.3d at 139 ("[A] police officer violates a person's constitutional right to bodily privacy when that officer manipulates the circumstances to view, to photograph, to videotape or otherwise to record that person's unclothed or partially unclothed body without his or her consent where, as here, there is no *conceivable* investigative or otherwise proper law-enforcement interest advanced by such a viewing." (emphasis added)). Additionally, to deprive the Individual Defendants of qualified immunity on the basis of Plaintiff's ipse dixit postulates as to their subjective bad faith—particularly when at least arguably belied by other allegations as to their efforts to ascertain whether she had been cut—is simply inconsistent with the objective approach of the qualified immunity analysis in such circumstances. *See Johnson*, 239 F.3d at 252 (finding the individual defendant's assault on a student "conscience-shocking" "[w]hen considered objectively as is required at the qualified immunity stage"); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 817–18 (1982) ("[B]are allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery."); *Appel v. Spiridon*, 521 F. App'x 9, 11 (2d Cir. 2013) ("[B]are allegations of malice coupled with otherwise legitimate government action generally do not yield a viable constitutional claim . . . ." (alterations, ellipses, and internal quotation marks omitted)). Therefore, Plaintiff's substantive due process claim is dismissed against the Individual Defendants on the basis of qualified immunity.

    3.  Liability of the School District

Having concluded that Plaintiff fails to state a claim under the Fourth Amendment and that the Individual Defendants are qualifiedly immune with respect to Plaintiff's Fourth Amendment and substantive due process claims, the question remains whether the School District can held liable.  As explained in the last Opinion, federal constitutional claims asserted against school districts are analyzed under *Monell v. Department of Social Services*, 436 U.S. 658 (1978) and its progeny, an analysis that requires, among other things, that a plaintiff prove "that an official policy of the [defendant] caused the constitutional injury," *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008).  While, as noted, Plaintiff need not prove this or other elements at this stage of the litigation, she must still plead facts sufficient to make plausible her claim for relief.  *See Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993) (concluding that there is no heightened pleading standard for *Monell* claims); *Santos v. New York City*, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012) (noting that to allege municipal liability under § 1983, "a plaintiff must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists").  In this respect, "[a]llegations that a defendant acted pursuant to a policy or custom without any facts suggesting the policy's existence, are plainly insufficient."  *Moore v. City of New York*, No. 08-CV-8879, 2010 WL 742981, at *6 (S.D.N.Y. Mar. 2, 2010) (internal quotation marks omitted).

Here, a review of the Amended Complaint makes clear that Plaintiff has failed to allege the existence of a policy.  The only allegations that even arguably intimate the existence of a policy consist of the following:

- Asserting that the School District "is responsible for the implementation and enforcement of all policies, practices, procedures, acts, and conduct regarding the administration of the matters affecting the students, parents, faculty, staff, and administrators of the

Clarkstown Central School District, including all matters relating to the safety, discipline and well[-]being of its students."  (*Id.* ¶ 2.)

- Characterizing Defendants' putative strip search of Plaintiff without contacting her parents as an unconstitutional and illegal "practice."  (*Id.* ¶¶ 7, 9.)

- Referring to Defendants' "indiscriminate, bad faith and harassing strip-search policy." (*Id.* ¶ 9.)

- "Monetary damages alone are inadequate under the facts and circumstances of this case and Plaintiff has suffered irreparable harm from defendants' actions, practices, policies, and procedures complained of here, and will continue to suffer such harm unless injunctive relief is granted as requested below."  (*Id.* ¶ 14.)

- "Upon information and belief, the source of which is the School District's attorney's failure to indicate whether any disciplinary action has been taken against the [I]ndividual Defendants, Defendant School District has neither disciplined any of the Individual Defendants for their clearly unconstitutional and tortious conduct, nor put in place policies to avert future constitutional violations."  (*Id.* ¶ 46.)

- "During all times relevant hereto, Defendant School District, its agents and employees, developed and maintained policies and/or customs exhibiting deliberate indifference to the Constitutional rights of Plaintiff and other students similarly situated, which caused a violation of Plaintiff's Fifth and Fourteenth Amendment rights."  (*Id.* ¶¶ 52, 58, 63.)

As before, these allegations—to the extent that they even really are allegations that such a policy existed—are insufficient for *Monell* purposes.  *See, e.g.*, *Simms v. City of New York*, No. 10-CV-3420, 2011 WL 4543051, at *3 (E.D.N.Y. Sept. 28, 2011) (citing *Iqbal*, 556 U.S. at 678–79) (dismissing conclusory allegations in *Monell* context that did not provide any facts that would allow the court to infer what city policies or practices led to the alleged deficiency), *aff'd*, 480 F. App'x 627 (2d Cir. 2012); *see also Triano v. Town of Harrison*, 895 F. Supp. 2d 526, 535–36 (S.D.N.Y. 2012) (noting that "mere allegations of a municipal custom or practice of tolerating official misconduct are insufficient to demonstrate the existence of such a custom unless supported by factual details" and collecting cases).  Therefore, Plaintiff's claim against the School District is dismissed.

4.  Remaining Claims

Now that the Court has dismissed Plaintiff's claims for violations of Plaintiff's Fourth

Amendment and substantive due process rights, all that remains are her claims for violations of

New York constitutional and statutory law.  (*See* Am. Compl. ¶¶ 65–109).[12]  As before, although

---

[12] Determining what claims remain in Plaintiff's Amended Complaint at this point is not quite as easy as one would expect.  For one thing, the first cause of action, which is labeled "Substantive Deprivation and Conspiracy to Deprive Plaintiff of Constitutional Rights Pursuant to 42 U.S.C. § 1983," is essentially unchanged from its analogue in the original Complaint, (*compare* Compl. ¶¶ 44–49, *with* Am. Compl. ¶¶ 48–53), despite the fact that Plaintiff had originally withdrawn her conspiracy charge, (*see* Op. & Order 24 (noting that, "[i]n her opposition to Defendants' Motion To Dismiss, Plaintiff abandoned her section 1983 conspiracy claim")), and aside from one deleted allusion to conspiracy within this cause of action, (*compare* Compl. ¶ 47 ("By reason of the conduct described herein, the Defendants have acted, *and conspired to act*, in violation of 42 U.S.C. § 1983 . . . ." (emphasis added)), *with* Am. Compl. ¶ 51 ("By reason of the conduct described herein, the Defendants have acted in violation of 42 U.S.C. § 1983 . . . .").)  Additionally, the Amended Complaint, like the original Complaint, alludes to deprivation of Plaintiff's Fifth and Sixth Amendment rights.  (*Compare* Am. Compl. ¶¶ 51, 61, *with* Compl. ¶¶ 47, 57.)  Apart, arguably, from the Fifth Amendment's due process guarantee—which, in any event, applies to the *federal* government, unlike the Fourteenth Amendment, *see Lindsey v. Lutz*, No. 10-CV-3931, 2011 WL 2791329, at *1 n.1 (S.D.N.Y. June 16, 2011) (noting that "the Due Process Clause of the Fifth Amendment applies to the federal government, while the Due Process Clause of the Fourteenth Amendment applies to states." (citing *Dusenbery v. United States*, 534 U.S. 161, 167 (2002)), *adopted by* 2011 WL 3628846 (S.D.N.Y. Aug. 17, 2011)—there is no indication which of Plaintiff's Fifth or Sixth Amendment rights she considered violated, notwithstanding the prior Opinion, which, through its silence, already made clear that the Court did not understand Plaintiff to be asserting a Fifth or Sixth Amendment claim.  Finally, although the Amended Complaint (again, like the original Complaint), includes language that "[a]t no point did the Defendant School District or the Individual Defendants provide Plaintiff with any proof of the accusations against her, or allow Plaintiff to dispute such accusation, or object to the unreasonable detention and searches described above," (Am. Compl. ¶ 62; *see also* Compl. ¶ 58 (same)), which arguably has something of a procedural due process flavor to it, Defendants (nor, for that matter, this Court in its prior Opinion) construed Plaintiff to be asserting a procedural due process claim in addition to a substantive due process claim, and Plaintiff has not suggested otherwise in her Opposition papers.  Therefore, in keeping with its reading of the Amended Complaint, the Court does not understand Plaintiff to bring claims for constitutional violations other than her Fourth and Fourteenth Amendment rights—Plaintiff is, after all, not a pro se party whose submissions are to be "construed liberally and interpreted to raise the strongest arguments that they suggest."  *Cf.*

the Court has "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution," *see* 28 U.S.C. § 1367(a), and although Plaintiff's state and federal claims plainly arise from parts of the same Article III case of controversy, *see SAT Int'l Corp. v. Great White Fleet (US) Ltd.*, No. 03-CV-7481, 2006 WL 661042, at *5 (S.D.N.Y. Mar. 16, 2006) ("Claims are part of the same case or controversy if they derive from a common nucleus of operative fact.")), the Court nevertheless declines to exercise jurisdiction over Plaintiff's remaining state-law claims, *see Klein & Co. Futures, Inc. v. Bd. of Trade*, 464 F.3d 255, 262 (2d Cir. 2006) ("It is well settled that where, as here, the federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims.").

---

*Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (alterations and internal quotation marks omitted).

### III. Conclusion

For the foregoing reasons, Defendants' Motion To Dismiss is granted.[13]  The Clerk of the

Court is respectfully requested to terminate the pending Motion, (*see* Dkt. No. 31), and close the

case.

SO ORDERED.

Dated:      August 22, 2016
            White Plains, New York

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[13] Because this Court has twice now concluded that Plaintiff's allegations fail to state a claim, and because it does not appear that a contrary conclusion is likely to be reached upon a third attempt, dismissal is with prejudice. *See, e.g.*, *Denny v. Barber*, 576 F.2d 465, 471 (2d Cir. 1978) (holding that the plaintiff was not entitled to "a third go-around"); *Anthony v. Brockway*, No. 15-CV-451, 2015 WL 5773402, at *3 (N.D.N.Y. Sept. 30, 2015) (dismissing amended complaint with prejudice where the "[p]laintiff has already been given one opportunity to amend his complaint . . . , and there is nothing in his second amended complaint suggesting that [he] could do better given another opportunity"); *Al-Qadaffi v. Servs. for the Underserved (SUS)*, No. 13-CV-8193, 2015 WL 585801, at *8 (S.D.N.Y. Jan. 30, 2015) (denying leave to amend where "[the plaintiff] has already had one chance to amend his [c]omplaint, and there is still no indication that a valid claim might be stated if given a second chance"), *aff'd*, 632 F. App'x 31 (2d Cir. 2016); *Bui v. Indus. Enters. of Am., Inc.*, 594 F. Supp. 2d 364, 373 (S.D.N.Y. 2009) (dismissing an amended complaint with prejudice where the plaintiff failed to cure the deficiencies identified in his complaint despite "being given ample opportunity to do so"); *cf. Treppel v. Biovail Corp.*, No. 03-CV-3002, 2005 WL 2086339, at *12 (S.D.N.Y. Aug. 30, 2005) (declining to grant leave to amend upon dismissing a complaint "because [the] plaintiff has already had two bites at the apple[,] and they have proven fruitless").

30